# PURCHASE AND SALE AGREEMENT
# AND JOINT INSTRUCTIONS

### (McConnell Rd. South – Finished Lots)

THIS PURCHASE AND SALE AGREEMENT AND JOINT INSTRUCTIONS (this "**Agreement**") is made and entered into as of March __21__, 2022 (the "**Agreement Date**"), by and between MCCONNELL ROAD SOUTH – GSO, LLC, a North Carolina limited liability company ("**Seller**"), and MERITAGE HOMES OF THE CAROLINAS, INC., an Arizona corporation ("**Buyer**"), for the purpose of setting forth the agreement of the parties and to provide instructions to METRO TITLE COMPANY, LLC, Attn: David Huffstetler, in its capacity as Escrow Agent ("**Escrow Agent**"), and NEXSEN PRUET, PLLC, Attn: Keith Burns, in its capacity as Closing Agent ("**Closing Agent**"), with respect to the transaction contemplated by this Agreement.

## RECITALS

A.     Seller has entered into a purchase and sale agreement (the "**Underlying Agreement**"), pursuant to which Seller will be acquiring from the "seller(s)" under the Underlying Agreement (the "**Underlying Seller**"), certain real property located in the City of Greensboro (the "**City**"), County of Guilford (the "**County**"), State of North Carolina, which includes approximately [195.38] acres, identified as a portion of Parcel ID Nos. 108815, 108819 and 108818, as more particularly described on Exhibit A attached hereto (collectively, the "**Land**").

B.     After acquiring title to the Land, Seller intends to obtain all applicable Governmental Approvals (as hereinafter defined) to subdivide the Land into a residential community to be developed in four (4) phases (each a "**Phase**") with a combined total of approximately seven hundred eighty-five (785) residential lots (each a "**Lot**" and, collectively, the "**Lots**"), comprised of (i) one hundred ninety-three (193) townhome Lots (collectively, the "**TH Lots**"), and (ii) five hundred ninety-two (592) single family detached Lots (collectively, the "**SF Lots**"), with dimensions, configurations and access points consistent with the preliminary site plan attached hereto as Exhibit B (the "**Preliminary Site Plan**").

C.     The Lots developed on the Land, together with the "Improvements," the balance of the "Real Property," and the "Intangible Property" related thereto (each as hereinafter defined), are collectively referred to in this Agreement as the "**Property**." The entirety of the Land depicted on Exhibit B, inclusive of the Lots, the roads, open space and common areas may be hereinafter referred to, collectively, as the "**Community**."

D.     For avoidance of doubt, the term "Property" as used herein (as the subject of this Agreement) does not include (and is not intended to include): (i) any portion of the Community, other than the Lots, or (ii) any additional land purchased by Seller pursuant to the Underlying Agreement including, but not limited, the additional 171 acres situated nearby on the north side of McConnell Road identified with Parcel Identification No(s). 120632, 120631, 108799, 120694 and 108815 (hereinafter, the "**Excluded North Parcels**" and, collectively, with the aforementioned excluded areas of the Community, the "**Excluded Property**").

**EXHIBIT A**

1

E.      Seller desires to sell, transfer, and convey the Property to Buyer, and Buyer desires to purchase and acquire the Property from Seller, upon and subject to the terms and conditions set forth in this Agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree, and instruct Escrow Agent and Closing Agent, as follows:

1.      PURCHASE AND SALE.

1.1      <u>Agreement</u>.  Subject to and upon all of the terms and conditions of this Agreement, Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase and acquire from Seller, good and marketable title, in fee simple, to all of the Property.

1.2      <u>Performance Under Underlying Agreement; Enforcement Rights</u>.  Seller's acquisition of the Land pursuant to the Underlying Agreement is a condition precedent to the performance obligations of Seller and Buyer under this Agreement, and to the Closings contemplated under this Agreement. Seller hereby covenants to timely and fully comply with and/or perform all covenants, obligations, and agreements of Seller under the Underlying Agreement.  If Seller, through no default of Seller under the Underlying Agreement, is unable to perform its obligations hereunder because it is not able to acquire the Land from the Underlying Seller pursuant to the Underlying Agreement, Seller shall not be in breach of this Agreement. Seller shall be obligated, however, to use commercially reasonable efforts (at all times acting in good faith) to enforce the terms of the Underlying Agreement. If Seller, despite its use of commercially reasonable efforts, is unable within sixty (60) days after a default by the Underlying Seller to cause Underlying Seller to proceed with closing for Seller's acquisition of the Land pursuant to the Underlying Agreement, then Buyer may elect to terminate this Agreement at any time thereafter by providing written notice to the Seller and Escrow Agent, in which event the Deposit shall be immediately returned to Buyer without the need for any prior authorization or consent from Seller.

1.3      <u>Buyer's Enforcement Rights</u>.  In addition, if at any time after a default by the Underlying Seller under the Underlying Agreement and prior to the termination of this Agreement in accordance with <u>Section 1.2</u>, Seller elects not to pursue legal action to cause Underlying Seller to proceed with closing for the purchase of the Land pursuant to the Underlying Agreement, then Seller shall deliver written notice of such election to Buyer and thereafter Buyer shall have the right, but not the obligation, to elect in its sole discretion, by delivery of written notice to Seller within thirty (30) days after Seller's notice of such election, to (a) attempt to enforce the Underlying Agreement, and Seller shall cooperate with Buyer in order to facilitate such enforcement, including, without limitation, permitting Buyer to act as Seller's agent for the limited purpose of enforcing the Underlying Agreement; or (b) require Seller to assign to Buyer, at no cost, all of Seller's rights, title, and interest in, to, and under the Underlying Agreement, in which event Seller hereby agrees to promptly perform, execute, and/or deliver or cause to be performed, executed, and/or delivered any and all such further acts, instruments, and assurances as may be

2

reasonably required to effectuate such assignment. If, and only if, Buyer elects to attempt to enforce the Underlying Agreement pursuant to clause (a) above, and Buyer is successful in such efforts, then the parties shall proceed to the Closing pursuant to the terms hereof, provided that the Purchase Price shall be reduced by all costs and expenses incurred by Buyer in pursing such enforcement, including, without limitation, attorney's fees, charges, disbursements, and the fees and costs of exert witnesses. Upon any assignment pursuant to clause (b) above, this Agreement shall be terminated and the Deposit shall be immediately delivered to Buyer. If Buyer does not timely elect in writing to attempt to enforce the Underlying Agreement pursuant to clause (a) above, or to require an assignment of the Underlying Agreement pursuant to clause (b) above, either Seller or Buyer may terminate this Agreement with respect to the Property at any time thereafter and prior to Buyer making either of such elections by providing written notice to the other party and Escrow Agent, in which event the Deposit shall be immediately delivered to Buyer.

2.    PURCHASE PRICE.

The total purchase price for the Property (the "**Purchase Price**") shall be equal to the aggregate sum of: (i) Sixty-Three Thousand and 00/100 Dollars ($63,000.00) for each of the initial TH Lots in the first Phase of the Community that are approved, completed, sold and delivered to Buyer in Finished Lot Condition (as hereinafter defined); (ii) Seventy-Four Thousand Two Hundred Fifty and 00/100 Dollars ($74,250.00) for each of the initial forty foot (40') wide SF Lots in the first Phase of the Community that are approved, completed, sold and delivered to Buyer in Finished Lot Condition; (iii) Eighty-One Thousand Seven Hundred Fifty and 00/100 Dollars ($81,750.00) for each of the initial fifty foot (50') wide SF Lots in the first Phase of the Community that are approved, completed, sold and delivered to Buyer in Finished Lot Condition; and (iv) thereafter, the foregoing "per Lot" prices shall be subject to escalation on a periodic basis for the remainder of the Lots, based on the size and type of the applicable Lot and the timing of the applicable Closing, pursuant to and in accordance with the closing and price escalation schedule attached hereto as <u>Exhibit I</u> (hereinafter, the "**Closing and Price Escalation Schedule**"), all of which shall be payable to Seller as follows:

2.1    <u>Deposit</u>. Within five (5) Business Days (as hereinafter defined) after the Escrow Date (as hereinafter defined), Buyer shall deposit into Escrow (as hereinafter defined) the sum of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) (the "**Initial Deposit**"). The Initial Deposit shall be fully refundable to Buyer through the Due Diligence Termination Date. If Buyer delivers the Feasibility Notice (as hereinafter defined) and Seller is not then in default of any of its obligations under this Agreement, Buyer shall, within five (5) Business Days after the Due Diligence Termination Date, deposit into Escrow the additional sum of Five Million Four Hundred Twenty-Seven Thousand Six Hundred Fifty One and 00/100 Dollars ($5,427,651.00) (the "**Additional Deposit**"). As used in this Agreement, the term "**Deposit**" means, collectively, such portion of the Initial Deposit and the Additional Deposit as has theretofore been deposited into Escrow, the aggregate amount of which ($6,177,651.00) is intended to be approximately equal to ten percent (10%) of the aggregate Purchase Price for all of the Lots. Until disbursed pursuant to this Agreement, Escrow Agent shall invest the Deposit in a federally insured interest-bearing account, as Buyer may instruct from time to time, and all interest earned on the Deposit, if any, shall be and remain the property of Buyer. If Buyer delivers a Feasibility Notice (as hereinafter defined), the Deposit shall become non-refundable after the Due Diligence Termination Date,

3

except as provided otherwise in this Agreement, and shall be credited against the Purchase Price, as provided in <u>Section 2.2</u> below.

     2.2    <u>Deposit Credit</u>.  At each Closing, Buyer shall receive a credit from Seller for a portion of the Deposit in the amount equal to ten percent (10%) of the Purchase Price for the Lots being purchased at each Closing (each a "**Deposit Credit**") and applied against the Purchase Price payable at each such Closing.

     2.3    <u>Balance</u>.  At each Closing, as more specifically set forth in <u>Section 7</u> below, Buyer shall deliver to Escrow Agent the balance of the Purchase Price for the applicable Lots, less the amount of the Deposit Credit applicable to such Closing, by wire transfer or other delivery of immediately available funds, net of all prorations and adjustments as provided in this Agreement.

     2.4    <u>Release and Use of Deposit</u>. After the Due Diligence Termination Date (provided Buyer has delivered a Feasibility Notice), and provided Seller is not then in default of any of Seller's obligations under this Agreement, and subject to all of the additional conditions below, portions of the Deposit may be released by Escrow Agent as follows: (a) a portion of the Deposit in the amount equal to Seller's total settlement costs for the purchase of the Land (including the purchase price payable by Seller for the Land pursuant to the Underlying Agreement, plus reasonable settlement charges payable by Seller in connection with the closing under the Underlying Agreement (hereinafter, the "**Underlying Closing**"), which amount shall be confirmed and approved by Buyer prior to the Underlying Closing (such approval not to be unreasonably withheld, conditioned or delayed) (hereinafter, the "**Initial Released Portion**"); and (b) after the Underlying Closing and following Seller's commencement of development activities on the Property, Seller shall provide Buyer with copies of its draw requests provided to its Senior Lender (as hereinafter defined) along with any accompanying engineer report to Escrow Agent together with copies of all conditional lien waivers from lien claimants being paid from such draw request pursuant to which Seller may seek reimbursement from the remainder of the Deposit (less the Initial Released Portion) for other actual out-of-pocket costs incurred and paid for by Seller in connection with the development of the Lots in accordance with the approved Budget (as hereinafter defined), and subject to the following requirements and conditions. Upon receipt of such documents from Seller and upon approval from Buyer, which approval shall not be unreasonably withheld, conditioned or delayed, Escrow Agent shall disburse the applicable portion of the remainder of the Deposit directly to Seller within five (5) Business Days unless Buyer delivers to Escrow Agent and Seller within three (3) Business Days of receipt of the Seller's draw request a written, specific and detailed objection to release of any portion of the Deposit.   Should Buyer deliver such written notice to Escrow Agent and Seller, then Escrow Agent shall promptly release to Seller the amount of the Deposit requested which was not subject to Buyer's objection. As to any timely objection by Buyer, Seller, the Engineer and/or Senior Lender shall respond to Buyer's objection within three (3) Business Days; provided however that Buyer agrees that the Engineer shall have the final decision as to the timing and amount of the release of any portion of the Deposit to Seller pursuant to any draw request.

The above-described disbursements from the Deposit shall be subject to all of the following additional conditions precedent, which conditions may only be waived by Buyer in a writing executed by Buyer:

2.4.1    With respect to the Initial Released Portion of the Deposit, Seller must concurrently close on the purchase of all of the Land at the Underlying Closing and must have recorded (or caused to be recorded) a mutually agreed upon form of a warranty deed from the Underlying Seller to Seller to vest insurable title to all of the Land in Seller as of the Underlying Closing.

2.4.2    Seller must have delivered to Buyer and Buyer shall have approved, in advance and in writing, in Buyer's commercially reasonable discretion: (i) Seller's budget for the development of the Lots and the remainder of the Community (the "**Budget**"), and (ii) the form and substance of all loan documents and security instruments (collectively, the "**Senior Loan Documents**") intended to evidence and secure any senior acquisition and development loan, which Seller intends to secure with a voluntary lien granted against the Property (hereinafter, the "**Senior Loan**").

2.4.3    The aggregate amount of principal (not including accrued interest, protective advances and other amounts due under the Senior Loan Documents) secured by liens against the Property as of the release of any portion of the Deposit to, or for the benefit of, Seller pursuant to this Section 2.4 which are intended to be senior in priority to the Deed of Trust (as hereinafter defined), shall not exceed $36,200,000.00 (the "**Senior Loan Cap**"), excluding any future protective advances permitted under the Intercreditor Agreement (as hereinafter defined).

2.4.4    Seller must have executed and delivered to Buyer an originally executed and acknowledged Deed of Trust substantially in the form attached hereto as Exhibit "H" (the "**Deed of Trust**") granted by Seller, as trustor, for the benefit of Buyer, as beneficiary, and Escrow Agent shall have caused the Deed of Trust to be recorded in in the official records of the County (the "**Official Records**"), whereupon Escrow Agent shall obtain and distribute conformed copies thereof to Buyer and Seller. If Seller obtains or closes on any Senior Loan after the Deed of Trust is recorded in the Official Records, Buyer agrees to subordinate the Deed of Trust to the Senior Loan Documents including, without limitation, any security instrument intended to secure the Senior Loan, subject to the Senior Loan Cap and execution and delivery of the Intercreditor Agreement (as hereinafter defined).

2.4.5    Title Insurer (as hereinafter defined) shall be irrevocably and unconditionally prepared and committed to issue and deliver to Buyer an ALTA Extended Coverage Lender's Policy of Title Insurance in the amount of the full Deposit, showing fee simple title to the Property vested in Seller (hereinafter, "**Buyer's Loan Policy**"), subject only to the Permitted Exceptions (including the Senior Loan in an amount not to exceed the Senior Loan Cap), and insuring the lien of the Deed of Trust in no lower than second lien position against the Property (behind only the Senior Loan in an amount not to exceed the Senior Loan Cap), and containing such endorsements as Title Insurer has committed to issue prior to such time. The cost of the Buyer's Loan Policy shall be paid by Seller, and the cost of any endorsements to the Buyer's Loan Policy shall be paid by Buyer.

2.4.6    Buyer, Seller and the lender expected to fund the Senior Loan (the "**Senior Lender**"), as applicable, must have entered into an intercreditor agreement (the "**Intercreditor Agreement**"), which shall be substantially in the form set forth in Exhibit "J" attached hereto, and must: (a) not allow any advances to Seller that are secured by the Property in excess of the Senior

5

Loan Cap, (b) require written notice of any default thereunder to be concurrently delivered to Buyer, and (c) give Buyer the right to bring the Senior Loan current or otherwise cure any default by Seller within a commercially reasonable cure period as may be agreed upon between Buyer and the Senior Lender.

2.4.7   As of the release of any portion of the Deposit to Seller pursuant to this Section 2.4, there shall not be any lien on the Property that would prohibit the recordation of the Deed of Trust, or for which the recordation of the Deed of Trust would constitute a violation thereof or default thereunder including, but not limited to, any Senior Loan.

3.      ESCROW.

3.1     Escrow Date.  Buyer and Seller shall cause an escrow ("**Escrow**") to be established with Escrow Agent by delivery to Escrow Agent of a fully-executed copy of this Agreement and Seller's delivery of its Internal Revenue Service Form W-9 to Buyer and Escrow Agent.  Upon receipt, Escrow Agent shall promptly deliver to Buyer and Seller written notice of the "Escrow Date".  As used herein, the term "**Escrow Date**" means the day on which Escrow Agent receives a fully-executed copy of this Agreement and Seller's Form W-9 and has notified each party in writing of such receipt.

3.2     Instructions.  This Agreement shall constitute instructions to Escrow Agent and Closing Agent as well as the agreement of the parties.  If any other printed instructions are requested of the parties by Escrow Agent and/or Closing Agent and the terms thereof conflict or are inconsistent with any provision of this Agreement or any deed, instrument, or document executed or delivered in connection with the transaction contemplated hereby, the provisions of this Agreement, or such deed, instrument, or document shall control.  Without limiting the foregoing, no provision in any printed form instructions shall excuse any performance by either party at the times provided in this Agreement, provide either party hereto with any grace period not provided in this Agreement, indemnify or excuse Escrow Agent or Closing Agent for its negligence or willful failure to perform its duties, or give Escrow Agent, Closing Agent, and/or any broker or other third party any rights in the Deposit, and any such provision shall be deemed void and of no effect.  Escrow Agent is hereby appointed and designated to act as Escrow Agent, and Closing Agent is hereby appointed and designated to act as Closing Agent, and each is instructed to deliver, pursuant to the terms of this Agreement, the documents and funds to be deposited with Escrow Agent and/or Closing Agent, as applicable, as herein provided

3.3     Termination.  Upon any termination of this Agreement by either of the parties hereto as expressly allowed under this Agreement (including, without limitation, any deemed termination), (a) Buyer shall return to Seller the Property Materials (as hereinafter defined), (b) the Deposit shall be delivered to the party that this Agreement specifies is entitled thereto, (c) all other documents, instruments, and funds delivered to Escrow Agent and/or Closing Agent shall be returned to the party that delivered the same thereto; and (d) the parties shall thereafter be relieved from further liability hereunder, except with respect to any obligations under this Agreement that are expressly stated to survive any termination of this Agreement.  A copy of any notice of termination allowed under this Agreement and sent to a party shall also be sent to Escrow Agent and Closing Agent by the party electing to terminate.

3.4 <u>Closing Protection Letter</u>. If Closing Agent acts as an agent for an underwriter and does not directly issue policies of title insurance, then Closing Agent agrees that as a condition to acting in such capacity for this transaction, it shall, concurrently with its acceptance of this Agreement, cause its underwriter to issue to Buyer an escrow and closing protection letter or insured escrow and closing service in written form satisfactory to Buyer.

4. ACTIONS PENDING CLOSING.

4.1 <u>Due Diligence</u>.

4.1.1 <u>Property Materials</u>.

4.1.1.1 Within five (5) Business Days after the Escrow Date (the "**Document Delivery Date**"), Seller shall provide to Buyer, at Seller's sole cost and expense, true, correct, and complete copies of all of the following documents (collectively, the "**Property Materials**") to the extent within Seller's possession or control, or written notice as to the non-existence of any such Property Materials, as applicable:

(a) Any title insurance policy or title commitment obtained by Seller with respect to the Land;

(b) Any and all surveys of all or any portion of the Land;

(c) Any existing, proposed, or draft site plans, plats, maps, landscaping plans, architectural plans and specifications, construction plans and drawings, engineering plan sets and any current engineered cost estimates, and development plans for the Property (including, without limitation, with respect to offsite development related to the Property), and all CAD files related to any of the forgoing;

(d) Any and all existing environmental reports concerning the Real Property;

(e) All leases, occupancy agreements, operating agreements, and licenses that affect the Property;

(f) All zoning stipulations, agreements, and requirements that affect or that are proposed to affect the Property;

(g) All archaeological, biological, soil, geological, grading, drainage, and hydrology reports, surveys, or assessments and any other engineering reports for the Property;

(h) The contact information for all engineers, architects, draftspersons, and/or consultants known to Seller to have information concerning the Property and/or its development (each of whom Buyer shall be authorized to contact, discuss the Property and/or its development with, and, if desired by Buyer, retain at Buyer's expense);

(i) Tax data and/or certificates for the Property;

7

(j)     A true, correct, and complete copy of the Underlying Agreement and all amendments thereto (dollar amounts therein may be redacted), together with any other agreements or understandings between Seller and Underlying Seller with respect to the Land, and, to the extent not otherwise required to be delivered pursuant to this <u>Section 4.1.1.1</u>, all documents and materials furnished to Seller by the Underlying Seller;

(k)     Any proposed or existing covenants, conditions, easements, and restrictions for any of the Community, together with any proposed or existing organizational documents related to any homeowners or other association formed or proposed to be formed pursuant thereto or otherwise with respect to any of the Real Property and/or the Community, if any (the "**Association(s)**"); and

(l)     Any other third-party reports, contracts, and agreements of any kind pertaining to the Property.

4.1.1.2   To the extent any items described in <u>Section 4.1.1.1</u> were obtained by Seller from third-party consultants paid by Seller and/or with whom Seller contracted and such items are not addressed or certified to Buyer, Seller shall, with no cost to Seller, on or before the initial Closing Date, use commercially reasonable efforts to cause each such preparer of such items to provide Buyer with a reliance letter reasonably acceptable to Buyer confirming Buyer's right to rely upon and use such items.

4.1.1.3   Seller shall promptly furnish to Buyer for its review (a) any of the items described in <u>Section 4.1.1.1</u> that may come into Seller's possession or control from and after the Document Delivery Date, and (b) any additional documents and information related to the Property in the possession or control of Seller and reasonably requested in writing by Buyer.

    4.1.2   <u>Buyer's Diligence Tests</u>.

4.1.2.1   At all reasonable times prior to each Closing (or earlier termination of this Agreement), Buyer and its employees, agents, consultants, and contractors shall be entitled, at Buyer's sole cost and expense, to: (a) enter onto the Real Property to perform any inspections, investigations, studies, and tests of the Real Property (including, without limitation, physical, engineering, soils, geotechnical, and environmental tests) that Buyer deems reasonable; (b) review all Property Materials; and (c) investigate such other matters pertaining to the Property as Buyer may desire.  In addition, on or after the Initial Takedown Period, Buyer and its employees, agents, consultants, and contractors shall have the right to enter upon and use certain unpurchased Lots for the following purposes: (i) placement of directional and marketing signage; (ii) parking of motor vehicles on Lots immediately adjacent to any model home(s) and pedestrian access to such model home(s); and (iii) placement of a construction trailer and/or temporary sales trailer on a Lot to be mutually determined by Seller and Buyer.  Buyer's entry onto and inspections of the Real Property in accordance with the terms of this Agreement shall not damage the Real Property in any material respect.  Any entry by Buyer onto the Real Property shall be subject to, and conducted in accordance with, all applicable laws.

4.1.2.2   Buyer shall indemnify, defend, and hold Seller and its agents, employees, and representatives (each an "**Indemnified Party**" and collectively, the "**Indemnified Parties**") harmless from and against any and all claims (including, without limitation, claims for mechanic's liens or materialman's liens), causes of action, demands, obligations, losses, damages, liabilities, judgments, costs, and expenses (including, without limitation, reasonable attorneys' fees, charges, and disbursements) (collectively, "**Claims**") to the extent caused by any entry upon the Real Property by Buyer, its agents or representatives pursuant to this Section 4.1.2; provided, however, that Buyer shall have no responsibility or liability for (a) any act or omission of any Indemnified Party; (b) any adverse condition or defect on or affecting the Property not caused by Buyer or its employees, agents, consultants, or contractors but discovered or impacted during their inspections including, without limitation, the pre-existing presence or discovery of any matter (such as, but not limited to, any "Hazardous Substance" (as hereinafter defined)); (c) the results or findings of any inspection or the disclosure of such results or findings; and/or (d) Buyer's election to terminate this Agreement as a result of any inspection pursuant to this Agreement.

4.1.2.3   If this Agreement is terminated by Buyer other than pursuant to Section 12.1 upon a default or breach by Seller, Buyer shall repair any material damage to the Property caused by its entry thereon and restore the same to substantially the same condition in which it existed prior to such entry.

4.1.2.4   The provisions of this Section 4.1.2 shall survive each Closing or the earlier termination of this Agreement.

4.1.3   Buyer's Termination Right.   Buyer shall have the right at any time on or before March 31, 2022 (the "**Due Diligence Termination Date**") to terminate this Agreement by delivering a written notice of such termination to Seller and Escrow Agent if Buyer determines in its sole and absolute discretion that the Property is not acceptable to Buyer for any reason.  Buyer shall indicate its satisfaction and/or waiver of the Due Diligence condition described in this Section 4.1 by delivering written notice of such satisfaction and/or waiver (the "**Feasibility Notice**") to Seller and Escrow Agent on or prior to the Due Diligence Termination Date. In the event Buyer fails to timely deliver the Feasibility Notice, then this Agreement and the Escrow shall be automatically deemed terminated.  In the event this Agreement is terminated in accordance with this Section, then Escrow Agent is hereby authorized to, and shall, immediately release and return the Deposit to Buyer, without any separate authorization from Seller.

4.2   Title and Survey.

4.2.1   Title Documents.  Closing Agent, as agent for First American Title Company, or another title insurer acceptable to Buyer ("**Title Insurer**"), shall issue and deliver to Buyer (a) a current commitment for a 2006 ALTA owner's policy of title insurance with North Carolina modifications for the Real Property in an amount not less than the Purchase Price (the "**Commitment**") and (b) legible copies of all documents referenced therein (collectively with the Commitment, the "**Title Documents**").

4.2.2   Buyer's Review of Title.   Buyer shall have until the Due Diligence Termination Date to notify Seller in writing of any objection that Buyer may have to any matters reported or shown in the Title Documents or in any survey obtained by Buyer, or any amendments

9

or updates thereof ("**Buyer's Objection Letter**") (provided, however, that if any amendments or updates are received by Buyer after or within ten (10) days before the Due Diligence Termination Date, Buyer shall have an additional five (5) days following Buyer's receipt of such amendment or update and copies of all documents referenced therein to notify Seller of objections to matters shown on any such amendment or update that were not disclosed on the previously delivered Title Documents). Matters shown in Schedule B, Part or Section Two of the Commitment (or any amendments or updates thereof) that are not timely objected to by Buyer as provided above shall be deemed to be "**Permitted Exceptions**." Seller shall cooperate with Buyer to eliminate title exceptions objected to by Buyer, but except as set forth in <u>Section 4.2.3</u>, Seller shall have no obligation to cure or correct any matter objected to by Buyer. On or before the fifth (5th) Business Day following Seller's receipt of Buyer's Objection Letter, Seller may elect, by delivering written notice of such election to Buyer and Escrow Agent ("**Seller's Response**"), to cause Title Insurer to remove or insure over any matters objected to in Buyer's Objection Letter. If Seller agrees to cause Title Insurer to so remove or insure over any such matters but fails to do so prior a Closing, then such failure shall be a Seller default and Buyer shall be entitled to pursue its rights and remedies pursuant to the terms of <u>Section 12.1</u>. If Seller fails to deliver Seller's Response within the period set forth above, it shall be deemed an election by Seller not to cause Title Insurer to so remove or insure over such objections. If Seller elects or is deemed to have elected not to cause Title Insurer to so remove or insure, or if Buyer determines, in its sole discretion, that any proposed endorsement for or insurance over an objected matter is unsatisfactory, then Buyer must elect, by delivering written notice of such election to Seller and Escrow Agent on or before the later to occur of (a) the fifth (5th) Business Day following Buyer's receipt of Seller's Response, or the date on which Seller is deemed to have responded, or (b) the Due Diligence Termination Date, to either (i) terminate this Agreement, in which case the Deposit shall be promptly returned to Buyer, without any separate authorization from Seller; (ii) terminate this Agreement solely as it pertains to any Lots affected by the title exception to which Buyer objects, in which case the amount of the Deposit Credit shall be adjusted (based on the total number of Lots that remain subject to this Agreement), and proceed with the remainder of the transaction in accordance with the terms of this Agreement; or (iii) proceed with this transaction in its entirety, in which event those objected to exceptions or matters that Seller has not elected to cause Title Insurer to so remove or insure shall be deemed to be Permitted Exceptions. If Buyer fails to make such election on a timely basis, then Buyer shall be deemed to have elected to proceed with the transaction, in its entirety, in accordance with the preceding clause (iii).

      4.2.3 <u>Seller Title Matters</u>. Notwithstanding anything else stated herein, in all events, regardless of whether Buyer has given notice of objection as stated in <u>Section 4.2.2</u> (and Buyer need not object to any such matters), Seller shall: (a) be obligated to satisfy and otherwise remove all monetary and financial liens and encumbrances in existence as of the Agreement Date or incurred by Seller on or before a Closing hereunder (other than current taxes not yet due) and any additional encumbrances incurred by Seller after the Agreement Date in violation of any provision of this Agreement; (b) except as may be otherwise specifically set forth in this Agreement, terminate all leases, possessory agreements, licenses, and other agreements that affect possession of the Property and cause all parties-in-possession title exceptions shown on the Commitment, if any, to be deleted; (c) except for items that are expressly made the obligation of Buyer in this Agreement, satisfy all requirements shown in Schedule B, Part or Section One of the Commitment (or any amendments or updates thereof); and (d) execute and deliver at each Closing all documents reasonably requested by the Title Insurer in order to remove the "standard

exceptions" in the Owner's Title Policy, including, but not limited to, the mechanic's liens, possession, and unrecorded matters exceptions, to insure the so-called "gap" between the effective date of the Commitment and the recordation of the Deed, and stating that, except as may be shown on a survey obtained by Buyer or Seller: (i) No additional improvements have been constructed upon Real Property by Seller; (ii) Seller has not given any right of way or easement of any nature across the Real Property, except as may be reflected in the Official Records, and Seller has no knowledge of anyone claiming an easement or right of way across the Real Property which is not reflected in the Official Records; and (iii) Seller has no knowledge of any encroachment of improvements into any easements on the Real Property, any encroachment of improvements from the Real Property onto the adjacent property or from the adjacent property onto the Real Property, or any boundary line discrepancy or dispute with respect to the Real Property.

4.2.4   <u>Title Update</u>.  At least ten (10) days prior to each Closing, Escrow Agent shall deliver to Buyer an update to the Commitment with an effective date of no more than fifteen (15) days prior to the next scheduled Closing Date, together with legible copies of documents for any new exception or requirements.  Buyer shall have the right to object to any new exceptions and requirements, and Seller shall be obligated to take all necessary action to remove any new exceptions and satisfy all new requirements prior to the Closing.

4.2.5   <u>Condition of Title at Closing</u>.  Upon each Closing, Seller shall sell, transfer, and convey to Buyer fee simple title to the Real Property that is the subject of such Closing by a duly executed and acknowledged deed in the form of <u>Exhibit "C"</u> attached hereto (the "**Deed**"), subject only to the Permitted Exceptions.

4.3   <u>Governmental Approvals Contingency</u>.  Seller shall use commercially reasonable efforts to obtain all necessary approvals from the City, the County, and all other applicable governmental authorities, quasi-governmental authorities, and/or utility providers and regulators (collectively, the "**Governmental Authorities**") of all the following in form and substance acceptable to Buyer, including expiration of all applicable protest, appeal, and referendum periods without a protest, appeal, or referendum being filed (or if a protest, appeal, or referendum has been filed, then on the date that such protest, appeal, or referendum has been resolved on terms satisfactory to Buyer): (a) rezoning of the use of the Land to permit Buyer's intended residential development of the Property (the "**Rezoning**"); (b) a site plan and/or subdivision plats in material accordance with the Preliminary Site Plan and the Rezoning confirming Seller's ability to develop and subdivide the Land, as contemplated in the Preliminary Site Plan, and to develop the Property into at least seven hundred eighty five (785) Lots with dimensions and lot configurations reasonably acceptable to Buyer and materially consistent with the Preliminary Site Plan (the "**Final Plat**"); and (c) all grading plans, utility plans, stormwater plans, street and sidewalk plans, construction drawings and plans for all other onsite and offsite infrastructure necessary or convenient for the development of the Community in accordance with the Final Plat, together with the issuance of all permits required to develop the Community in accordance with such plans and the Final Plat and all agreements and arrangements with Governmental Authorities necessary for developing the Community as provided in such plans and in the Final Plat and for providing to the Community all utility services necessary or desirable for Buyer's construction of residential improvements on the Lots (collectively, the "**Engineering Approvals**"). The approval by all applicable Governmental Authorities of the Rezoning, Final Plat and all Engineering Approvals shall be referred to herein collectively as the "**Governmental Approvals**."  After the Agreement

Date, Seller and Buyer must mutually agree on all applicable applications, plats, stipulations, requirements, and documents related to the Governmental Approvals and Seller shall pursue the Governmental Approvals and conduct all negotiations with the Governmental Authorities expeditiously, promptly, and in good faith, all at the sole expense of Seller. Buyer will cooperate with Seller's efforts to obtain the Governmental Approvals at no out-of-pocket expense to Buyer. Seller shall provide Buyer with two (2) Business Days advance notice of all meetings with Governmental Authorities, engineers, and any other parties related to the Governmental Approvals and Buyer shall have the right to attend and participate in all such meetings. All plans, plats, and other documents related to the Governmental Approvals and all contracts related to the preparation thereof shall name Buyer as a party entitled to use and rely thereon, and Seller shall promptly provide Buyer with copies thereof.

5.      DESCRIPTION OF PROPERTY AND DEVELOPMENT PROVISIONS.

        5.1     The Real Property.  As used in this Agreement, the term "**Real Property**" shall mean, collectively, all of Seller's right, title, and interest in and to: (a) all of the Lots approved for development on the Land pursuant to the Governmental Approvals; (b) all buildings, structures, and improvements thereto or thereon, if any (the "**Improvements**"); and (c) all of the rights, privileges, appurtenances, hereditaments, easements, reversions, and remainders pertaining to or used in connection with the Lots, and/or any of the Improvements (if any), including, without limitation, all (i) development rights, water capacity, sewer, wastewater and reuse water rights, sewage treatment capacity, other utility capacity, rights, and approvals, and permits relating to the Lots, (ii) strips and gores, streets, alleys, easements, rights-of-way, public ways, or other rights appurtenant, adjacent, or connected to any of the Lots, and (iii) minerals, oil, gas, and other hydrocarbon substances in, under, or that may be produced from the Lots.

        5.2     The Intangible Property.  As used in this Agreement, the term "**Intangible Property**" shall mean all of Seller's right, title, and interest in and to that certain intangible property owned by Seller or used by Seller exclusively in connection with the development of the Lots and any related Real Property, if any, including, without limitation, all of Seller's right, title, and interest, if any, in and to:  (a) all plats, improvement plans, drawings and specifications, including any CAD files, and development rights and credits relating to the Real Property, (b) all books, records, reports, test results, environmental assessments, if any, as-built plans, specifications, and other similar documents and materials relating to the use, operation, maintenance, repair, construction, or fabrication of all or any portion of the Real Property; (c) the nonexclusive right to use any trademarks and trade names associated with the Community; (d) all transferable business licenses, architectural, site, landscaping or other permits, applications, approvals, authorizations, pre-paid fees, and other entitlements specifically relating to the Real Property; and I all transferable guarantees, warranties, and utility contracts relating to all or any portion of the Real Property.

        5.3     Completion and Maintenance of Community.  Seller shall cause all streets, common area improvements and utility improvements related to the development of the Community including, without limitation, all retention or detention ponds, common areas and entry monuments, to be completed in accordance with applicable subdivision regulations and in accordance with the Engineering Approvals. For a period of one (1) year after the Fourth Closing, Seller shall have the repair and maintenance obligation for publicly dedicated improvements in the

Community that have been constructed by or on behalf of Seller, that have not been accepted for public maintenance by the applicable Governmental Authorities, and that serve any of the Lots, including, without limitation, final lift of asphalt and such other repairs and maintenance as are necessary for the applicable Governmental Authorities to accept the repair and maintenance obligation at the end of any applicable warranty period. Seller shall likewise repair and maintain all areas within the Community owned by Seller that are to be "common areas" but are not owned by the Association, including private streets (if any), common area improvements, including without limitation, detention ponds and other stormwater control measures, and common area landscaping until such common areas are conveyed to the Association. Additionally, until such common areas are conveyed to the Association, conditions that present a hazard or materially detract from the aesthetics of the Community shall be repaired by the Seller in a timely fashion. Notwithstanding any of the foregoing, Seller shall not be required to apply the final lift of asphalt on the roads within the Property until certificates of occupancy have been obtained for at least ninety percent (90%) of the homes on the Lots in the applicable portion of the Property. The foregoing repair and maintenance obligation of Seller excludes any damage caused by Buyer, its employees, agents and contractors and shall survive each Closing.

       5.4   <u>Performance Bonds</u>. Seller will post and will maintain throughout the term of this Agreement all bonds and guaranties, if any, required by Governmental Authorities in connection with the Seller's installation of all improvements and amenities intended to serve the Community including, without limitation, roads, sidewalks, streetlights and street trees.

       5.5   <u>Obligations to Repair Streets, Roads and Other Improvements</u>. After the Initial Closing (as hereinafter defined), each Party shall be responsible for repairing, at its sole expense, any damage to the pavement, curbs and gutters, sidewalks, storm drainage system and other improvements caused by or arising out of actions by such Party, its employees, agents, contractors and subcontractors. During the term of this Agreement, the Parties will make periodic inspections of the streets, roads, common area parking areas and other improvements within the Property and will note the damages and determine the causation. If the Parties agree that Buyer, its agents or subcontractors have caused damage to the roads, streets, common area parking areas or other improvements in the Community, then Seller will notify Buyer of such damages and, unless otherwise provided herein, Buyer agrees to then repair the same. If Buyer fails to commence repair of the damages within twenty (20) business days following Seller's notice to Buyer and thereafter diligently pursue such repair to completion, then Seller may perform such work on Buyer's behalf, and Buyer shall be deemed to have contracted with Seller for such repair. Upon completion of any such repair work, Seller shall submit an invoice to Buyer for the reasonable and actual out-of-pocket costs incurred by Seller in making such repairs and Buyer shall pay such invoice within ten (10) business days following its receipt from Seller. If Buyer disagrees with Seller's assessment that Buyer is responsible for any such damage or otherwise determines that Seller, its agents or subcontractors have caused damage to the roads, streets or other improvements, then Buyer will notify Seller of such damages and Seller agrees to then repair the same. If Seller fails to commence repair of the damages within twenty (20) business days following Buyer's notice to Seller and thereafter diligently pursue such repair to completion, then Buyer may perform such work on Seller's behalf, and Seller shall be deemed to have contracted with Buyer for such repair. Upon completion of any such repair work, Buyer shall submit an invoice to Seller for the reasonable and actual out-of-pocket costs incurred by Buyer in making such repairs. Seller shall pay such invoice within ten (10) business days following its receipt from Buyer.

5.6     Use of Concrete Washout Area.  After the Initial Closing, Seller shall designate in writing to Buyer the concrete washout areas on the Property.  Buyer shall use commercially reasonable efforts to ensure that its concrete trucks only use the concrete washout area so designated.  Buyer shall cause the removal of accumulated concrete material deposited by its contractors from this area on a routine basis.

5.7     Community Amenities.  Prior to the Second Closing (as hereinafter defined), Seller shall have constructed an amenity center with a community pool, playground and clubhouse for the Community in conformance with the plans and specifications approved by Buyer on or before the Initial Closing, which approval shall not be unreasonably withheld, delayed or conditioned (collectively, the "**Amenities**").  Once completed, Seller shall promptly convey the Amenities and related common areas to the Association free and clear of all liens and encumbrances. If Seller fails to complete the Amenities by the deadline for the Second Closing (as set forth in Section 7.1 below), then, without limiting Buyer's remedies under this Agreement by reason of Seller's default, (a) Buyer's obligation to purchase Lots in accordance with this Agreement shall abate by a period of time equal to the delay in timely completion of the Amenities, and (b) Buyer may (but shall have no obligation to) elect to complete the Amenities, at the expense of Seller, as more fully specified below.  If, following any uncured default by Seller, Buyer elects to complete the Amenities at Seller's expense, then, without limiting Buyer's remedies under this Agreement by reason of Seller's default (and not in limitation of the abatement provided for above), all costs incurred by Buyer in so doing shall be payable by Seller to Buyer upon demand therefore accompanied by evidence of such costs so incurred, and such amounts shall bear interest at the rate of 10% per annum until paid.  If not sooner paid, Buyer may elect to receive payment of such amounts in the form of a credit against the Purchase Price payable by Buyer at the next Closing and/or any subsequent Closing(s) until fully credited.  If Buyer makes such election to complete the Amenities, then Buyer shall have a temporary access and construction easement upon such portions of the Community as may be useful or necessary for Buyer to complete the construction of the Amenities, and Seller shall cooperate with and assist Buyer in providing any information which may be reasonably requested concerning the Amenities including the status of the work, payments previously made, invoices outstanding and copies of contracts and other materials, and Seller hereby authorizes Buyer to use all plans, contracts, materials and information which may be necessary or desirable for the completion of the Amenities and the payment of the costs thereof.

5.8     Maintenance of Property. Until the common areas are conveyed to the Association, the maintenance of landscaping at the entrances to the Property, and the common areas shall be performed by a professional landscape maintenance company engaged by Seller, at Seller's expense, to ensure quality and a consistent appearance and shall include at a minimum: (i) regular grass cutting; (ii) bi-annual re-mulching of all planting beds; (iii) bi-annual installation of seasonal flowers to maintain color at each Entry Feature; and (iv) seasonal irrigation system service and maintenance.  The cost of maintaining these common areas shall be an expense of the applicable Association paid by the Seller through Seller's funding of the operating expense shortfall of the applicable Association until such time as the applicable portion of the Property is turned over to the applicable Association at which time such of maintenance shall be solely the responsibility of the applicable Association.  Seller shall also be responsible for the periodic bush-hogging and regular grass cutting to a minimum depth of twenty feet (20') from the back of curb along all street frontage of all unfinished common areas and vacant Lots until sold to Buyer or conveyed to the Association.  This task shall be performed as often as necessary to ensure a well-maintained

14

appearance for the Property. In the event that Seller fails to comply with the foregoing, Buyer shall have the right, in its sole election, after notice to Seller of its failure to comply and Seller's failure to cure within fifteen (15) days, to perform same and to receive reimbursement from Seller within the earlier of five (5) days of demand therefore or the next Closing.

6.      CONDITIONS TO CLOSING.

6.1     <u>Buyer's Closing Conditions</u>.  The obligation of Buyer to complete each of the Closings contemplated by this Agreement is subject to the following conditions precedent (and conditions concurrent, with respect to deliveries to be made by Seller at the Closing) (collectively, the "**Buyer's Closing Conditions**"), which conditions may be waived, or the time for satisfaction thereof extended, by Buyer only in a writing executed by Buyer (any such waiver or extension to apply only to the Lots and the Closing as to which the waiver or extension is given, without prejudice to Buyer's right to demand prompt satisfaction of the condition at any future Closing):

6.1.1   <u>Title</u>.  Title Insurer must be irrevocably and unconditionally prepared and committed to issue to Buyer (with an effective date not earlier than the Closing Date), a 2006 ALTA Extended Owner's Policy of Title Insurance with North Carolina modifications in favor of Buyer for the applicable Real Property (a) showing fee title to the applicable Real Property vested in Buyer as of the applicable Closing, (b) with liability coverage in an amount equal to the Purchase Price, and (c) containing no exceptions other than the Permitted Exceptions (the "**Owner's Title Policy**").

6.1.2   <u>Seller's Due Performance</u>. All of the representations and warranties of Seller set forth in this Agreement must be true, correct, and complete in all material respects as of the Closing Date, and Seller, on or prior to the Closing Date, shall have complied with and/or performed all of the obligations, covenants, and agreements required on the part of Seller to be complied with or performed pursuant to the terms of this Agreement on or prior to the Closing.

6.1.3   <u>No Moratorium</u>. As of the Closing Date, there must be no moratorium, injunction, restraining order, or similar restriction imposed by any of the Governmental Authorities or any private entity that precludes or prevents the issuance of building permits or certificates of occupancy with respect to the Real Property and/or the construction of residences or other improvements on the Real Property.

6.1.4   <u>Bankruptcy</u>.  No action or proceeding shall have been commenced by or against Seller under the federal bankruptcy code or any state law for the relief of debtors or for the enforcement of the rights of creditors, and no attachment, execution, lien, or levy shall have attached to or been issued with respect to Seller's interest in the Property or any portion thereof.

6.1.5   <u>Governmental Approvals</u>. All Governmental Approvals must have been obtained in accordance with <u>Section 4.3</u> hereof.

6.1.6   <u>Off-site Easements</u>.  All off-site easements, rights-of-way, licenses, permits and agreements required from any third party to access the Property, construct improvements on the Lots and/or to provide to the Lots all water, sewer and other utility services that are required in connection with the Government Approvals for Buyer's intended residential development of the

Property, must have been obtained in form and content satisfactory to Buyer in Buyer's reasonable discretion.

6.1.7    Design Approvals. Buyer must have obtained written confirmation, to Buyer's reasonable satisfaction, from the Association (and each applicable board and/or committee thereof) and all applicable Governmental Authorities or other parties with approval rights over the Community and/or the development of the Lots, of their approval of Buyer's plans, drawings and elevations for construction of residential structures and improvements on the Lots in accordance with the Governmental Approvals.

6.1.8    Possession.  All lessees, tenants, and occupants of the Property, if any, must have vacated the Property so that sole and exclusive possession of the Property can be provided to Buyer at the Closing.

6.1.9    Community Covenants. Seller must have formed an Association and shall have prepared, or caused to be prepared, a declaration of covenants, conditions and restrictions for the Community (the "**Declaration**"), which shall be in form and substance reasonably acceptable to Buyer. The Declaration shall provide, among other things, that Buyer is exempt from (a) payment of any assessments, fees, dues or other charges to the Association, (b) any architectural review requirements (other than preliminary approval as set forth in Section 6.1.6 above), and (c) any restrictions on Buyer's ability to market, sell, construct and maintain residential structures and improvements in the Community.  Prior to filing the organizational documents for the Association and recording the Declaration (collectively, the "**Association Documents**"), Seller shall first provide a copy thereof to Buyer for its review and approval, such approval not to be unreasonably withheld, delayed or conditioned.  Within fifteen (15) Business Days after receipt thereof, Buyer may provide written notice of any disapproval of the submitted Association Documents and advise Seller in writing of the specific changes thereto required by Buyer ("**Disapproval Notice**").  If Buyer fails to timely deliver a Disapproval Notice within such fifteen (15) Business Days period, then Buyer shall be deemed to have approved those Association Documents submitted for approval.  If Buyer timely delivers a Disapproval Notice, then Seller may accept by written notice any or all of Buyer's proposed specific changes and the parties shall confer in good faith to resolve Buyer's remaining objections.  The Association shall be managed by a management company and Seller shall be solely responsible for funding any deficit in the amounts needed to fund the Association and maintain all amenities and common areas.

6.1.10   Finished Lots.  The Lots purchased at each Closing must meet the "Finished Lot Condition" set forth on Exhibit "D" attached hereto before the applicable Closing. Seller shall cause the Lots in each Phase to meet the Finished Lot Condition not later than fifteen (15) days prior to the scheduled Closing Date for such Phase, as set forth in the Closing and Price Escalation Schedule. Seller shall cause the remaining portions of the Community including, without limitation, the entry monument(s), access roads and the amenities required under this Agreement (including all such improvements described in Exhibit "D") to be completed by the completion deadlines described in Exhibit "D."  At least fifteen (15) days prior to each Closing, Buyer and Seller will perform a pre-closing visual inspection of the Lot(s) and any related portion of the Community which are the subject of the Closing, and Buyer shall be permitted to prepare a punch list of all items not in compliance with this Agreement. Seller shall correct all punch list items within fifteen (15) days after the pre-closing inspection and prior to the applicable Closing.  If

16

Seller fails to timely correct the punch list items, then Buyer shall have the right to either: (a) proceed to Closing and allow Seller to complete the punch list items after the Closing, subject to a reasonable holdback from Seller's net sale proceeds in an amount to be agreed upon between Seller and Buyer (each party agreeing to act reasonably and in good faith); or (b) postpone the Closing until the punch list items are corrected. If Buyer has elected to proceed with Closing on any Lots which remain subject to punch list repairs to be completed by Seller after the Closing, and Seller fails to correct all punch list items to Buyer's reasonable satisfaction within thirty (30) days after the Closing then, without limiting Buyer's remedies under this Agreement by reason of Seller's default, (i) Buyer may (but shall have no obligation to) elect to complete the punch list items at Seller's expense; (ii) all costs incurred by Buyer in so doing shall be deducted first from the applicable holdback funds, and any additional costs incurred by Buyer above the amount of holdback funds shall be payable by Seller to Buyer upon demand therefor accompanied by evidence of such costs so incurred, and such amounts shall bear interest at 15% per annum until paid; (iii) alternatively, if not sooner paid, Buyer may elect to receive payment of such amounts in the form of a credit against the Purchase Price payable by Buyer at the next Closing and/or any subsequent Closing(s) until fully credited; (iv) Buyer must be granted a temporary access and construction easement upon such portions of the Community as may be useful or necessary for Buyer to complete the punch list items, (v) Seller must cooperate with and assist Buyer in providing any information which may be reasonably requested concerning the punch list items, including the status of the work, payments previously made, invoices outstanding and copies of contracts and other materials; and (vi) Seller hereby authorizes Buyer to use all plans, contracts, materials and information which may be necessary or desirable for the completion of the punch list items and the payment of the costs thereof.

6.1.11 <u>Age Restriction Covenant Applicable to Excluded North Parcels</u>. Seller and Buyer acknowledge and agree that (a) Buyer contracted with Seller to purchase the Excluded North Parcels pursuant to a separate purchase and sale agreement entered between the parties on or about November 2, 2021 (hereinafter, the "**North Parcel PSA**"); (b) pursuant to the North Parcel PSA, the parties have agreed that the Excluded North Parcels shall be entitled and subdivided by Seller into approximately six hundred fifteen (615) approved and permitted lots consisting of (i) approximately 435 homesites of varying size (including both townhome lots and single family lots) but all with widths in excess of 26 feet (hereinafter, collectively, the "**North Parcel Age Restricted Lots**"), and (ii) a maximum of 180 traditional attached townhome lots, each with a minimum width of 26 feet (hereinafter, collectively, the "**North Parcel Traditional TH Lots**"); and (c) Buyer has negotiated, or is in the process of negotiating an assignment and assumption agreement with LENNAR CAROLINAS, LLC, a Delaware limited liability company (hereinafter, "**Lennar**"), pursuant to which Buyer will assign its rights, as buyer, under the North Parcel PSA to Lennar (hereinafter, the "**Lennar Assignment Agreement**"). Subject to Seller's closing on the purchase of the Excluded Property pursuant to the Underlying Agreement, Seller hereby consents to the Lennar Assignment Agreement, and agrees as a condition precedent to the Initial Closing (as hereinafter defined) to cause any deed(s) granted (or to be granted) by Seller to Lennar (pursuant to the North Parcel PSA) and concerning the North Parcel Age Restricted Lots to contain a deed restriction, which must (i) be, in form and substance acceptable to Seller, Lennar and Buyer in their commercially reasonable discretion, (ii) limit or restrict the marketing and sale of the homes to be constructed on the North Parcel Age Restricted Lots to adults aged 55 and over in accordance with the federal Housing for Older Persons Act and all related and applicable fair housing laws (hereinafter, the "**North Parcel Age Restriction Covenant**"), (iii) expressly exclude

17

(and not be applicable to) the North Parcel Traditional TH Lots, and (iv) upon closing under the North Parcel PSA, shall be recorded, in the official records of the County, as a covenant that runs with the Excluded North Parcels. If, for any reason, Lennar does not agree to the Lennar Assignment Agreement, or elects, after execution of the Lennar Assignment Agreement to terminate the North Parcel PSA or defaults under the North Parcel PSA and does not purchase the Excluded North Parcels, Seller and Buyer must have agreed upon, each acting reasonably and in good faith, the terms of an option agreement (hereinafter, the "**Springing Option**") pursuant to which Seller shall grant Buyer an irrevocable option to purchase the Excluded North Parcels from Seller on terms substantially similar to the terms and conditions set forth in the North Parcel PSA within ninety (90) days after Buyer's receipt of written notice thereof from Seller, unless otherwise agreed, in writing, between Buyer and Seller. Notwithstanding anything herein to the contrary, if Lennar does not close on the purchase of the Excluded North Parcels pursuant to the North Parcel PSA (or any replacement or restated version thereof), and Buyer does not elect to purchase the Excluded North Parcels pursuant to the Springing Option, then Seller will thereafter be under no obligation to Buyer whatsoever to include any deed restriction of any type or for any purpose related to the Excluded North Parcels.

6.1.12 <u>Amenities</u>. As to the Second Closing, Seller must have completed construction of the Amenities in accordance with Section 5.7 and all applicable Governmental Approvals.

6.2 <u>Failure of Buyer's Closing Conditions</u>. If any of Buyer's Closing Conditions described in <u>Section 6.1</u> above have not been fulfilled within the applicable time periods, Buyer may:

6.2.1 Waive the unfulfilled Buyer's Closing Condition and close Escrow in accordance with this Agreement, without adjustment or abatement of the Purchase Price;

6.2.2 Extend the Closing until the tenth (10th) Business Day after Buyer's receipt of written notice and evidence that Buyer's Closing Conditions are satisfied, and during which time Buyer's obligations to purchase Lots in accordance with <u>Section 7.1</u> shall abate until Buyer's receipt of written notice and evidence that Buyer's Closing Conditions are satisfied; or

6.2.3 Terminate this Agreement in whole or with respect to the Lot or Lots as to which the condition has failed by written notice to Seller and Escrow Agent, in which event (a) any portion of the Deposit that has not been applied as a Deposit Credit shall be immediately returned or refunded to Buyer by Seller, provided that in the case of a partial termination only that portion of the Deposit applicable to the Lots that are the subject of the termination will be returned, and (b) to the extent that the failure of any applicable Buyer's Closing Condition is caused by a Seller default, Buyer shall be entitled to pursue its rights and remedies pursuant to the terms of <u>Section 12.1</u>.

7. CLOSING.

7.1 <u>Closing Date</u>. Subject to the provisions of this Agreement (including satisfaction of all Buyer's Closing Conditions), **(a)** the first Closing (the "**Initial Closing**") shall take place within fifteen (15) days after Seller delivers written notice to Buyer that all Lots in the first Phase of the Property (hereinafter, "**Phase 1**"), which shall consist of (i) seventy-two (72) TH Lots, (ii)

18

thirty-six (36) 40' SF Lots, and (iii) twenty-one (21) 50' SF Lots, satisfy the Finished Lot Condition; **(b)** the second Closing (the "**Second Closing**") shall take place within six (6) months after the Initial Closing and shall consist of all Lots in the second Phase of the Community (hereinafter, "**Phase 2**"), which shall consist of (i) ninety-one (91) TH Lots, (ii) eighty-nine (89) 40' SF Lots, and (iii) sixty-two (62) 50' SF Lots; **(c)** the third Closing (the "**Third Closing**") shall take place within eighteen (18) months after the Second Closing and shall consist of all Lots in the third Phase of the Community (hereinafter, "**Phase 3**"), which shall consist of (i) forty-five (45) TH Lots, (ii) ninety-seven (97) 40' SF Lots, and (iii) forty-seven (47) 50' SF Lots; and **(d)** the fourth and final Closing (the "**Fourth Closing**") shall take place within twelve (12) months after the Third Closing and shall consist of all Lots in the fourth Phase of the Community (hereinafter, "**Phase 4**"), which shall consist of (i) one hundred sixty-four (164) 40' SF Lots, and (ii) sixty-one (61) 50' SF Lots. Unless otherwise agreed, in writing, between Seller and Buyer, Seller shall use commercially reasonable efforts, at all times acting in good faith, to cause the Lots to be substantially completed in the aforementioned Phases by the approximate dates contemplated in the Closing and Price Escalation Schedule attached hereto as <u>Exhibit B</u>. The Lots for each Closing must be in Finished Lot Condition as of the applicable Closing, except as otherwise provided herein. The number of Lots to be acquired at each Closing, as set forth above, reflects the minimum number of Lots to be purchased and closed by Buyer on or before the next Closing deadline (each a "**Takedown Period**"). Buyer will be entitled to purchase any number of Lots (above the minimum number described above) during any Takedown Period in one or multiple Closings, provided the applicable Lots in the applicable Phase have been completed by Seller and are in Finished Lot Condition. Any quantity of Lots purchased by Buyer in excess of the minimum number of Lots during any Takedown Period will count as a credit toward the next Takedown Period. Moreover, if at any Closing the remaining number of Lots is fewer than the minimum number of Lots required to be acquired at such Closing, then the takedown for such Closing shall be reduced to the actual number of such Lots remaining to be purchased hereunder. As used herein, "**Closing**" means the recordation of the Deed for the applicable Lot(s) in the Official Records; and the "**Closing Date**" means the date upon which the Closing actually occurs. Notwithstanding anything to the contrary, should any Closing deadline fall on a Friday or Monday, or on a weekend or legal holiday, the applicable Closing shall automatically be extended to the following Tuesday.

7.2     <u>Deliveries by Seller</u>.  On or before each Closing Date, Seller, at its sole cost and expense, shall deliver or cause to be delivered to the Closing Agent (to be held in escrow pending the Closing) the following items, documents, and instruments, each dated as of the Closing Date, fully executed and, if appropriate acknowledged or attested to, and, if applicable, in proper form for recording:

7.2.1     <u>Deed</u>.  The Deed conveying the applicable Real Property to Buyer;

7.2.2     <u>Non-Foreign Affidavit</u>.  A Non-Foreign Affidavit in the form attached hereto as <u>Exhibit "E"</u> (the "**Non-Foreign Affidavit**");

7.2.3     <u>General Assignment</u>.  A general assignment to Buyer of the Intangible Property in the form attached hereto as <u>Exhibit "F"</u> (the "**General Assignment**");

7.2.4     <u>Declarant Rights</u>.  A partial assignment, in a form reasonably acceptable to Buyer, of all Declarant rights applicable to the Real Property under all declarations of covenants,

19

conditions and restrictions applicable to the Real Property, if any ("**Declarant Rights Assignment**");

7.2.5    Assignment of Warranties.  A non-exclusive assignment of Seller's rights and interests in all guarantees and warranties in the plans and contracts for the development of the Community in the form attached hereto as Exhibit "G" (the "**Assignment of Warranties**");

7.2.6    Tax Certificates.  Paid tax certificates showing that all property taxes for the Property have been paid for the years prior to the year of the Closing if provided by the Governing Jurisdiction;

7.2.7    Proof of Authority.  Such proof of Seller's authority and authorization to enter into this Agreement and the transaction contemplated hereby, and such proof of the power and authority of the individual(s) executing or delivering any instruments, documents, or certificates on behalf of Seller to act for and bind Seller as may be reasonably required by Title Insurer, Escrow Agent, Closing Agent or Buyer; and

7.2.8    Other.  Such other items, documents, and instruments as may be reasonably required by Buyer, Title Insurer, Closing Agent, or otherwise in order to effectuate the provisions of this Agreement and the Closing and/or otherwise to fulfill the covenants and obligations to be performed by Seller at the Closing pursuant to this Agreement, including, without limitation, a title affidavit as to those items or facts within Seller's control in form typically required by Title Insurer and sufficient to allow Title Insurer to delete the "standard exceptions" in a title insurance policy, including, but not limited to (a) rights of parties in possession other than record owners, (b) any lien, or right to lien, for services, labor, or materials heretofore or hereafter furnished, imposed by law and not shown in the Official Records, and (c) defects, liens, encumbrances adverse claims or other matters, if any, created, first appearing in the public record or attaching subsequent to the effective date of the Commitment but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by the Commitment.

7.3    Deliveries by Buyer.  On or before each Closing Date, Buyer, at its sole cost and expense, shall deliver or cause to be delivered to the Closing Agent (to be held in escrow pending the Closing) the following funds and the following items, documents, and instruments, each dated as of the Closing Date, fully executed and, if appropriate acknowledged or attested to, and, if applicable, in proper form for recording:

7.3.1    Purchase Price.  Cash or other immediately available funds in an amount equal to the Purchase Price applicable to the Lots that are the subject of the Closing, less the Deposit Credit applicable to such Closing, plus all of Buyer's share of the Closing Costs;

7.3.2    Proof of Authority.  Such proof of Buyer's authority and authorization to enter into this Agreement and the transaction contemplated hereby, and such proof of the power and authority of the individual(s) executing or delivering any instruments, documents, or certificates on behalf of Buyer to act for and bind Buyer as may be reasonably required by Title Insurer, Closing Agent, or Seller;

7.3.3    Other.  Such other items, documents, and instruments as may be reasonably required by Seller, Title Insurer, Closing Agent, or otherwise in order to effectuate the provisions

of this Agreement and the Closing and/or otherwise to fulfill the covenants and obligations to be performed by Buyer at the Closing pursuant to this Agreement.

7.4     Actions by Escrow Agent and Closing Agent.  Provided that Closing Agent has not received written notice from Buyer of the failure of any condition to such Closing or of the termination of the Escrow and this Agreement, when Buyer and Seller have deposited with Closing Agent all of the documents and funds (other than the Deposit being held by Escrow Agent) required by this Agreement and Title Insurer is irrevocably and unconditionally prepared and committed to issue the Owner's Title Policy in accordance with the terms hereof, Closing Agent shall notify the Escrow Agent thereof.  Provided that Escrow Agent has not received written notice from Buyer of the failure of any condition to a Closing or of the termination of the Escrow and this Agreement, when Escrow Agent has been informed by Closing Agent that Buyer and Seller have deposited with Closing Agent all of the documents and funds (other than the Deposit being held by Escrow Agent) required by this Agreement and Title Insurer is irrevocably and unconditionally prepared and committed to issue the Owner's Title Policy in accordance with the terms hereof, Escrow Agent shall deliver to Closing Agent the Deposit, whereupon Closing Agent, in the order and manner herein below indicated, shall take the following actions to effectuate such Closing:

7.4.1     Recording.  Cause the Deed and any other documents customarily recorded and/or that the parties hereto may mutually direct to be recorded in the Official Records and obtain conformed copies thereof for distribution to Buyer and Seller.

7.4.2     Funds.  Disburse all funds as follows:

7.4.2.1     Pursuant to the "Closing Statement" (as hereinafter defined), pay to Escrow Agent and retain for Closing Agent's own account any applicable escrow/closing fees and costs, disburse to Title Insurer the fees and expenses incurred in connection with the issuance of the Owner's Title Policy, and disburse to any other persons or entities entitled thereto the amount of any other Closing Costs and any other disbursements reflected on the Closing Statement;

7.4.2.2     Disburse to Seller an amount equal to the Purchase Price applicable to the Lots that are the subject of the Closing, less the applicable Deposit Credit for such Lots, and less or plus the net debit or credit to Seller by reason of the prorations and allocations of Closing Costs and any other disbursements reflected on the Closing Statement or other adjustments provided for in this Agreement; and

7.4.2.3     Disburse to the party who deposited the same any remaining funds in the possession of Closing Agent after the payments pursuant to Sections 7.4.1.1 and 7.4.1.2 above have been completed.

7.4.3     Delivery of Documents.  Deliver: (a) to Seller one copy of all documents deposited into Escrow; and (b) to Buyer, (i) one original of all documents deposited into Escrow (other than the Deed and the other documents recorded pursuant to the terms of this Agreement), and (ii) one conformed copy of each document recorded pursuant to the terms of this Agreement. Originals of any documents recorded after Closing shall be delivered after such recording to Buyer.

      7.4.4   <u>Owner's Title Policy</u>.  Cause Title Insurer to issue or be irrevocably and unconditionally prepared and committed to issue the Owner's Title Policy to Buyer.

     7.5     <u>Prorations/Apportionment</u>.

      7.5.1   <u>Method of Proration</u>.  Taxes and assessments affecting the Property shall be prorated between Buyer and Seller as of each Closing Date based on a 365-day calendar year.  All non-delinquent real property taxes and assessments on the Property shall be prorated based on the actual current tax bill, but if such tax bill has not yet been received by Seller by such Closing Date or if supplemental taxes are assessed after such Closing for the period prior to such Closing, the parties shall make any necessary adjustment after such Closing by cash payment to the party entitled thereto so that Seller shall have borne all real property taxes, including all supplemental taxes, allocable to the period prior to such Closing and Buyer shall bear all real property taxes, including all supplemental taxes, allocable to the period from and after such Closing.  If any expenses attributable to the Property and allocable to the period prior to a Closing are discovered or billed after such Closing, the parties shall make any necessary adjustment after such Closing by cash payment to the party entitled thereto so that Seller shall have borne all expenses allocable to the period prior to such Closing and Buyer shall bear all expenses allocable to the period from and after such Closing.  All improvement and special liens and assessments shall be paid in full by Seller at or before such Closing. Notwithstanding the foregoing, if any taxes, assessments, penalties and/or interest (collectively, the "**Rollback Taxes**") are imposed or proposed against or related to the Property for any reason and which apply to or are based, calculated or assessed in some manner on periods prior to and through the year of such Closing, Seller shall pay such Rollback Taxes prior to such Closing and Seller shall furnish Escrow Agent with evidence of such payment.  If the Rollback Taxes have not been assessed by such Closing, then Seller will escrow the estimated amount of such taxes with Escrow Agent pursuant to an escrow agreement which provides that it may not be modified or terminated without the consent of Buyer, and upon receipt of a tax bill therefore, Escrow Agent will be authorized and instructed to pay the amount due.  If the amount due exceeds the amount deposited by Seller, Seller will pay the difference to Escrow Agent within thirty (30) days of Escrow Agent's notification to Seller that an additional amount is due hereunder.  Seller's obligations under this subsection shall survive each Closing.

      7.5.3   <u>Apportionment</u>.  If taxes and/or assessments must be prorated and/or paid before the appropriate tax/assessment records reflect the Property as a separate parcel, such taxes and/or assessments will be allocated between the Property and the rest of the applicable parcel on the basis of acreage, except that any taxes attributable to improvements will be allocated to the land on which the improvements are located.

      7.5.4   <u>Survival</u>.  The obligations under this <u>Section 7.5</u> shall survive each Closing and the delivery and recordation of the Deed for the Property.

     7.6    <u>Closing Costs</u>.  Each party shall pay its own costs and expenses arising in connection with each Closing (including, without limitation, its own attorneys' and advisors' fees, charges, and disbursements), except the following costs (the "**Closing Costs**"), which shall be allocated between the parties as follows (in addition to any other costs and expenses specifically allocated to the parties elsewhere in this Agreement):

7.6.1    Escrow Agent's escrow fees and costs shall be paid one-half by Seller and one-half by Buyer;

7.6.2    Seller shall pay (a) Seller's prorations pursuant to Section 7.5; (b) title curative instruments required pursuant to the terms of this Agreement, if any; and (c) state and local transfer taxes (documentary stamps) and fees; and

7.6.3    Buyer shall pay (a) Buyer's prorations in accordance with Section 7.5; (b) the Owner's Title Policy premium and the costs of any endorsements to the Owner's Title Policy requested by Buyer; and (c) fees for recording the Deed.

7.7    Closing Statement.  Two (2) Business Days prior to each Closing Date, Closing Agent shall deliver to each of the parties for their review and approval a preliminary closing statement (the "**Preliminary Closing Statement**") setting forth: (a) the Purchase Price payable at Closing and the amount of the Deposit Credit to be credited to Buyer at such Closing; (b) the proration amounts allocable to each of the parties pursuant to Section 7.5; (c) the Closing Costs allocable to each of the parties pursuant to Section 7.6; and (d) any other costs and expenses to be paid directly to third parties pursuant to the approved Closing Statement.  Based on each of the party's comments, if any, regarding the Preliminary Closing Statement, Closing Agent shall revise the Preliminary Closing Statement and deliver a final, signed version of the closing statement to each of the parties at the Closing (the "**Closing Statement**").

7.8    Deliveries Outside of Escrow.  Upon each Closing hereunder, Seller shall deliver sole and exclusive possession of the Lot(s) being acquired at the Closing to Buyer, subject only to the Permitted Exceptions.  Further, Seller hereby covenants and agrees to deliver to Buyer, on or prior to the Closing, the Intangible Property, including, without limitation, copies of the Property Materials not previously provided to Buyer.  Effective immediately upon each Closing, any personal property remaining on any of the Lot(s) being acquired at the Closing shall be deemed abandoned and may be removed and disposed of by Buyer at its sole cost and expense, without any obligation or liability to Seller.

8.    SELLER'S REPRESENTATIONS AND WARRANTIES.

Seller represents, and warrants to Buyer, as of the Agreement Date and as of each Closing Date, as follows:

8.1    Due Organization.  Seller is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of North Carolina and is duly qualified to transact business in the State of North Carolina.

8.2    Seller's Authority; Validity of Agreements.  Seller has full right, power, and authority to sell the Property to Buyer as provided in this Agreement and to carry out its obligations hereunder.  The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller has/have the legal power, right, and actual authority to bind Seller to the terms hereof and thereof.  This Agreement is, and all other instruments, documents and agreements to be executed, and delivered by Seller in connection with this Agreement shall be, duly authorized, executed, and delivered by Seller and the valid, binding, and enforceable obligations of Seller (except as enforcement may be limited by bankruptcy, insolvency, or similar laws) and do not, and

23

as of the Closing Date will not result in any violation of, or conflict with, or constitute a default under, any provisions of any agreement of Seller or any mortgage, deed of trust, indenture, lease, security agreement, or other instrument, covenant, obligation, or agreement to which Seller or the Property is subject, or any judgment, law, statute, ordinance, writ, decree, order, injunction, rule, ordinance, or governmental regulation or requirement affecting Seller or the Property.

8.3     No Third-Party Rights.  Except as may have been disclosed by Seller in the Property Materials, there are no leases, occupancy agreements, easements, licenses, or other agreements that grant third parties any possessory or usage rights to all or any part of the Property.

8.4     Litigation.  To Seller's knowledge, (a) there are no actions, investigations, suits, or proceedings (other than tax appeals or protests) pending or threatened that affect the Property, the ownership or operation thereof, or the ability of Seller to perform its obligations under this Agreement, and (b) there are no judgments, orders, awards, or decrees currently in effect against Seller with respect to the ownership or operation of the Property that have not been fully discharged prior to the Agreement Date.

8.5     Zoning and Condemnation.  To Seller's knowledge and except as may be disclosed in the Property Materials, there are no pending proceedings to alter or restrict the zoning or other use restrictions applicable to the Property (other than pursuit of the Governmental Approvals pursuant to Section 4.3 above), to condemn all or any portion of the Property by eminent domain proceedings or otherwise, or to institute a moratorium or similar restriction on building on or issuing certificates of occupancy for construction on the Property.

8.6     Bankruptcy.  There are no attachments, levies, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy, or any other debtor relief actions contemplated by Seller or filed by Seller, or to Seller's knowledge, pending in any current judicial or administrative proceeding against Seller.

8.7     No Violations of Environmental Laws.  To Seller's knowledge and except as may be disclosed in the Property Materials:  (a) the Property is not in, nor has it been or is it currently under investigation for violation of any federal, state, or local law, ordinance, or regulation relating to industrial hygiene, worker health and safety, or to the environmental conditions in, at, on, under, or about the Property, including, but not limited to, soil and groundwater conditions ("**Environmental Laws**"); (b) the Property has not been subject to a deposit of any Hazardous Substance (as hereinafter defined); (c) neither Seller nor any third party has used, generated, manufactured, stored, or disposed in, at, on, or under the Property any Hazardous Substance; and (d) there is not now in, on, or under the Property any underground or above ground storage tanks or surface impoundments, any asbestos containing materials, or any polychlorinated biphenyls used in hydraulic oils, electrical transformers, or other equipment.  Seller hereby assigns to Buyer as of the Closing all claims, counterclaims, defenses, and actions, whether at common law or pursuant to any other applicable federal, state or other laws that Seller may have against any third party or parties relating to the existence or presence of any Hazardous Substance in, at, on, under, or about the Property.  For purpose of this Agreement, the term "**Hazardous Substance**" shall be deemed to include any wastes, materials, substances, pollutants, and other matters regulated by Environmental Laws.

8.8     Fees.  Except as may be disclosed in the Property Materials, Seller has not received written notice from any Governmental Authority of any new (or increases in existing) development fees, impact fees, or other fees that will be levied (or are under consideration by any Governmental Authority) in connection with the development of the Property.

8.9     No Moratorium.  Seller has not received written notice from any of the Governmental Authorities of any policy or action precluding or inhibiting (a) issuance of grading or building permits with respect to the Lots; (b) approval of engineering plans, environmental impact reports, or preliminary or final plat maps with respect to the Lots; (c) issuance of certificates of occupancy for residences on the Lots; or (d) issuance of water, sewer, or other utility connection permits affecting the development of the Lots.

8.10    No Other Commitments.  Except as may be disclosed in the Commitment, Seller has not made any commitment or representation to any Governmental Authority, or any adjoining or surrounding property owner, that would in any way be binding on Buyer or would interfere with Buyer's ability to develop and improve the Property as a residential development, and Seller shall not make any such commitment or representation that would affect the Property or any portion thereof, without Buyer's written consent.

8.11    No Default.  Seller is not in default under the provisions of any deed of trust, mortgage, or other encumbrances, liens, or restrictions that affect the Property.

8.12    Endangered Species.  To Seller's knowledge and except as disclosed in the Property Materials, there are no threatened or endangered species or protected natural habitat, flora, or fauna on the Property nor are there any areas on or near the Property that are designated as wetlands or otherwise subject to the United States Army Corps of Engineers' Section 404 permit requirements.

8.13    Wells/Underground Tanks.  To Seller's knowledge and except as disclosed in the Property Materials, there are no wells, drilling holes, wellheads, or underground storage tanks located on or under the Property.

8.14    Landfill/Waste Disposal Site.  Seller has not used the Property and, to Seller's knowledge and except as disclosed in the Property Materials, the Property has never been used as a landfill, waste disposal site (including, without limitation, construction waste), or cemetery/burial site.

8.15    No Other Agreements.  Except as may be disclosed in the Property Materials and/or in the Senior Loan Documents, there are no shared expense agreements, repayment agreements, reimbursement agreements, or development payback agreements that affect all or any portion of the Property.

8.16    Property Materials.  To Seller's knowledge, there are no defects, deficiencies, or inaccuracies in any of the Property Materials, and all information furnished by Seller to Buyer pursuant to this Agreement is true, accurate, and complete and Seller has not intentionally withheld any material information regarding the Property within Seller's possession or control.

8.17    Financial Ability.  Seller is financially able to perform all of its obligations under this Agreement.

8.18    Flood Plain.  To the best of Seller's knowledge, the Property is not located within a FEMA designated Special Flood Hazard Area.

8.19    Finished Lots.  The Lots shall meet the Finished Lot Condition as of the applicable Closing Date.

8.20    Survival.  All of the representations and warranties of Seller set forth in this Agreement shall be true upon the Agreement Date, shall be deemed to be repeated at and as of the Closing Date, and shall survive the delivery of the Deed and each Closing.  Prior to a termination of this Agreement, Seller shall not take any action, fail to take any required action, or willfully allow or consent to any action that would cause any of Seller's representations and warranties to become untrue.

9.    BUYER'S REPRESENTATIONS AND WARRANTIES.

Buyer represents and warrants to Seller, as of the Agreement Date and as of each Closing Date, as follows:

9.1    Due Organization.  Buyer is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Arizona.

9.2    Buyer's Authority; Validity of Agreement.  Buyer has full right, power, and authority to purchase and acquire the Property from Seller as provided in this Agreement and to carry out its obligations hereunder.  The individual(s) executing this Agreement and the instruments referenced herein on behalf of Buyer has/have the legal power, right, and actual authority to bind Buyer to the terms hereof and thereof.  This Agreement is, and all instruments, documents, and agreements to be executed and delivered by Buyer in connection with this Agreement shall be, duly authorized, executed, and delivered by Buyer and shall be valid, binding, and enforceable obligations of Buyer (except as enforcement may be limited by bankruptcy, insolvency, or similar laws) and do not, and as of each Closing Date will not, violate any provision of any law, statute, ordinance, rule, regulation, agreement or judicial order to which Buyer is a party or to which Buyer is subject.

9.3    Survival.  All of the representations and warranties of Buyer set forth in this Agreement shall be true upon the Agreement Date, shall be deemed to be repeated at and as of each Closing Date.

10.    AS-IS.

THE PARTIES HEREBY ACKNOWLEDGE AND AGREE AS FOLLOWS: (A) BUYER IS A SOPHISTICATED BUYER WHO IS FAMILIAR WITH THIS TYPE OF PROPERTY; AND (B) EXCEPT AS MAY BE SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE DEED, AND/OR ANY OTHER DOCUMENT OR INSTRUMENT DELIVERED BY SELLER AT EACH CLOSING (THE "**EXPRESS REPRESENTATIONS**"), NEITHER SELLER NOR ANY OF ITS AGENTS, REPRESENTATIVES, BROKERS, OR EMPLOYEES HAS MADE OR WILL MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY.  SUBJECT TO THE EXPRESS REPRESENTATIONS

AND THE TERMS HEREOF, BUYER WILL BE AFFORDED THE OPPORTUNITY TO MAKE ANY AND ALL INSPECTIONS OF THE PROPERTY AND SUCH RELATED MATTERS AS BUYER MAY REASONABLY DESIRE AND, ACCORDINGLY, SUBJECT TO THE EXPRESS REPRESENTATIONS, BUYER WILL RELY SOLELY ON ITS OWN DUE DILIGENCE AND INVESTIGATIONS IN PURCHASING THE PROPERTY.

11.     RISK OF LOSS.

11.1     Condemnation.  If, prior to a Closing, all or any portion of the Real Property is taken by condemnation or eminent domain (or is the subject of a pending or contemplated taking which has not been consummated), Seller shall immediately notify Buyer of such fact.  In such event, Buyer shall have the option to terminate this Agreement in full, or solely with respect to the affected Lots, at Buyer's election, upon written notice to Seller given within sixty (60) days after receipt of such notice from Seller, in which event the entire Deposit shall be returned to Buyer if Buyer terminates the Agreement in full, without any separate authorization from Seller, or a pro rata portion of the Deposit shall be returned to Buyer if Buyer terminates the Agreement just as to the affected Lots.  Prior to any termination of this Agreement, Buyer shall have the right to participate in any proceedings and negotiations with respect to the taking and any transfer in lieu of taking (and Seller shall not consummate any transfer in lieu of taking without Buyer's prior written consent).  If Buyer does not terminate this Agreement in its entirety and elects to proceed with the Closing, then (a) Seller, at and as a condition precedent to Buyer's obligation to proceed with the Closing, must: (i) pay to Buyer (or direct Closing Agent to credit Buyer against the Purchase Price for) the amount of all awards for the taking (and any consideration for any transfer in lieu of taking) actually received by Seller to the extent that Buyer acquires the affected Lots; and (ii) assign to Buyer by written instrument reasonably satisfactory to Buyer all rights or claims to any future awards for the taking (and any consideration for any transfer in lieu of taking) to the extent that Buyer acquires the affected Lots; and (b) except to the extent that Buyer elects to terminate this Agreement as to the affected Lots, the parties shall proceed to the Closing pursuant to the terms hereof without further modification of the terms of this Agreement.

11.3     Casualty.  Prior to a Closing and notwithstanding the pendency of this Agreement, the entire risk of loss or damage by earthquake, hurricane, tornado, flood, landslide, fire, sinkhole, or other casualty shall be borne and assumed by Seller.  If, prior to a Closing, any portion of the Real Property is damaged as a result of any earthquake, hurricane, tornado, flood, sinkhole, landslide, fire, or other casualty, Seller shall immediately notify Buyer of such fact.  In such event, Buyer shall have the option to terminate this Agreement in full, or solely with respect to the affected Lots, at Buyer's election, upon written notice to Seller given within sixty (60) days after receipt of any such notice from Seller, in which event the entire Deposit shall be returned to Buyer if Buyer terminates the Agreement in full, or a pro rata portion of the Deposit shall be returned to Buyer if Buyer terminates the Agreement just as to the affected Lots.  Prior to any termination of this Agreement, Buyer shall have the right to participate in any adjustment of the insurance claim. If Buyer waives the right to terminate this Agreement in its entirety and elects to proceed with the Closing, then (a) Seller, at and as a condition precedent to Buyer's obligation to proceed with the Closing, must either: (i) pay to Buyer (or direct Closing Agent to credit Buyer against the Purchase Price for) the amount of any insurance proceeds actually received by Seller plus the amount of any deductible under Seller's insurance to the extent that Buyer acquires the affected Lots; or (ii) if no insurance proceeds have been received by Seller, assign to Buyer by written instrument reasonably

27

satisfactory to Buyer all rights or claims to the insurance proceeds and credit Buyer against the Purchase Price for any deductible payable under Seller's insurance policy to the extent that Buyer acquires the affected Lots; and (b) except to the extent that Buyer elects to terminate this Agreement as to the affected Lots, the parties shall proceed to the Closing pursuant to the terms hereof without further modification of the terms of this Agreement.

12.   REMEDIES.

12.1   <u>Default by Seller</u>.  If Seller shall breach any of the terms or provisions of this Agreement or otherwise fail to perform any of Seller's obligations under this Agreement at or prior to a Closing, and if such failure continues for ten (10) days after Buyer provides Seller and Escrow Agent with written notice thereof, and provided Buyer is not then in default, then Buyer may, as Buyer's sole remedies for such failure, but without limiting Buyer's right to recover attorneys' fees pursuant to Section 14.14 below: (a) waive the effect of such matter and proceed to consummate this transaction; (b) terminate this Agreement in full and receive a full refund of the portion of the Deposit that has not previously been applied to the Purchase Price at a completed Closing and recover from Seller the reasonable out-of-pocket expenses actually incurred by Buyer related to the Property and this transaction up to a maximum of $125,000.00; (c) terminate this Agreement with respect to the Lot or Lots that are the subject of such breach and receive a refund of that portion of the Deposit applicable to such Lots (based on the unapplied Deposit Credit for such Lots) and recover from Seller the reasonable out-of-pocket expenses actually incurred by Buyer related to the Property and this transaction up to a maximum of $125,000.00 in aggregate; or (d) proceed with an action against Seller for specific performance. Notwithstanding anything to the contrary above, Buyer's remedy of specific performance hereunder shall not include specific performance of Seller's obligation to develop and deliver Lots that satisfy the Finished Lot Condition. In the event of an uncured default by Seller and Buyer's election to seek the remedy of specific performance hereunder, if at such time all of the Lots have not been platted and/or do not satisfy the Finished Lot Condition at such time, then the parties agree that Buyer may obtain specific performance of Seller's obligation to sell the applicable portion of the Property to Buyer pursuant to the terms of this Agreement, provided that the Purchase Price for any portion of the Property that does not fully satisfy the Finished Lot Condition at such time shall be reduced by an amount equal to the sum of (i) the total amount of the estimated costs, as determined by the Engineer (as hereinafter defined), of completing the development of the Lots so that the Lots will satisfy the Finished Lot Condition, plus (ii) the total amount of all costs and expenses (including reasonable attorneys' fees) incurred by Buyer in enforcing its rights under this Agreement, plus (iii) any sums advanced by Buyer to (or for the benefit of) Senior Lender pursuant to or in accordance with the Intercreditor Agreement. When used herein, the term "**Engineer**" shall mean the engineering firm Timmons Group located in Raleigh, North Carolina. Notwithstanding anything herein to the contrary, if Buyer is unable to secure the remedy of specific performance as a result of Seller's intentional or willful actions or inaction, then Buyer shall be entitled to bring an action against Seller for any damages suffered or incurred by Buyer as a result of the breach or any failure by Seller to perform any of its obligations hereunder.  Nothing contained in this Section shall limit or prevent Buyer from enforcing Seller's obligations and liabilities and/or Buyer's rights that survive Closing or the termination of this Agreement, as applicable.

12.2   <u>Default by Buyer</u>.  If Buyer fails to purchase Lots as required hereunder and if such failure constitutes a default by Buyer and continues for ten (10) days after Seller provides Buyer

and Escrow Agent with written notice thereof, and provided Seller is not then in default, then Seller may waive such breach and proceed to consummate this transaction in accordance with the terms hereof, or Seller may, as its exclusive remedy, terminate this Agreement and retain the portion of the Deposit that has not previously been applied to the Purchase Price at a completed Closing as liquidated damages and as consideration for the acceptance of this Agreement and for taking the Property off the market, and not as a penalty. Buyer and Seller have determined and hereby agree that it would be impractical or extremely difficult, if not impossible, to ascertain with any degree of certainty the amount of damages that would be suffered by Seller if Buyer fails to purchase the Property in accordance with the provisions of this Agreement, and the parties agree that a reasonable estimate of such damages under the circumstances is an amount equal to the portion of the Deposit that has not previously been applied to the Purchase Price. Nothing contained in this Section shall limit or prevent Seller from enforcing Buyer's obligations and liabilities and/or Seller's rights that survive Closing or the termination of this Agreement, as applicable.

13.    BROKERS.

Each of Buyer and Seller hereby represents and warrants to and agrees with each other that it has not had, and shall not have, any dealings with any third party to whom the payment of any broker's fee, finder's fee, commission, or other similar compensation shall or may become due or payable in connection with the transaction contemplated hereby. Each of Buyer and Seller shall execute, and shall cause any broker engaged by such party to execute, any broker lien waiver affidavit reasonably requested by the Title Insurer. Seller shall indemnify, defend, protect, and hold Buyer harmless for, from, and against any and all Claims incurred by Buyer by reason of any breach or inaccuracy of the representation, warranty, and agreement of Seller contained in this Section. Buyer shall indemnify, defend, protect, and hold Seller harmless from and against any and all Claims incurred by Seller by reason of any breach or inaccuracy of the representation, warranty, and agreement of Buyer contained in this Section. The provisions of this Section shall survive each Closing or earlier termination of this Agreement. Seller acknowledges that certain principals, affiliates, officers, and employees of Buyer may be licensed real estate brokers and/or salespersons in the State of North Carolina.

14.    MISCELLANEOUS PROVISIONS.

14.1    Governing Law; Venue. This Agreement and the legal relations between the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of North Carolina, without regard to its principles of conflicts of law. Venue for any action brought to interpret or enforce this Agreement shall be any court of competent jurisdiction located in the State of North Carolina.

14.2    Entire Agreement. This Agreement, including the exhibits attached hereto, constitutes the entire agreement between Buyer and Seller pertaining to the subject matter hereof and supersedes all prior agreements, understandings, letters of intent, term sheets, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations, or other agreements, express or implied, made to either party by the other party in connection with the subject matter hereof except as specifically set forth herein or in the documents delivered pursuant hereto or in connection herewith.

14.3 <u>Modification; Waiver</u>. No supplement, modification, waiver, or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

14.4 <u>Notices</u>. All notices, consents, requests, reports, demands or other communications hereunder (collectively, "**Notices**") shall be in writing and may be given personally, by registered or certified mail, by electronic mail, by courier, or by Federal Express (or other reputable overnight delivery service) for overnight delivery, as follows:

| | |
|---|---|
| To **Seller**: | McConnell Road South – GSO, LLC<br>610 Pembroke Road, #10007<br>Greensboro, NC 27408<br>Attention: Zach Tran<br>Telephone: (336) 944-7919<br>E-mail: ztran@digllc.com |
| With A Copy To: | Isaacson Sheridan<br>804 Green Valley Road, Suite 200<br>Greensboro, NC 27408<br>Attention: Jennifer N. Fountain, Esq.<br>Telephone: (336) 609-5136<br>E-mail: jennifer@isaacsonsheridan.com |
| To **Buyer**: | Meritage Homes of the Carolinas, Inc.<br>3300 Paramount Parkway, Suite 120<br>Raleigh, NC 27560<br>Attention: Ric Rojas<br>Telephone: (919) 926-2610<br>E-mail: ric.rojas@meritagehomes.com |
| With A Copy To: | Meritage Homes Corporation<br>8800 E. Raintree Drive, Suite 300<br>Scottsdale, AZ 85260<br>Attention: Darrell S. Husband<br>Telephone: (480) 515-8984<br>E-mail: darrell.husband@meritagehomes.com |
| And With A Copy of<br>any Default Notice to: | Meritage Homes Corporation<br>8800 E. Raintree Drive, Suite 300<br>Scottsdale, AZ 85260<br>Attention: General Counsel |

30

| | |
|---|---|
| To **Escrow Agent**: | Metro Title Company, LLC<br>726 North Blount Street<br>Raleigh, NC 27604<br>Attention: David L. Huffstetler<br>Telephone: (919) 833-1284<br>E-mail: david.huffstetler@mettitle.biz |
| To **Closing Agent**: | Nexsen Pruet, PLLC<br>4141 Parklake Ave., Suite 200<br>Raleigh, NC 27612<br>Attention: Keith D. Burns<br>Telephone: (919) 653-7835<br>E-mail: kburns@nexsenpruet.com |

or to such other address or such other person as the addressee party shall have last designated by Notice to the other party, Escrow Agent and Closing Agent (in each instance, so long as such address is located in the United States of America). Each Notice shall be deemed to have been delivered, given, and received for all purposes as of the date so delivered, at the applicable address (so long as delivery is evidenced by the customary courier or U.S. mail receipt); provided that (a) Notices received on a day that is not a Business Day shall be deemed received on the next Business Day and (b) Notices by electronic mail shall be deemed delivered on the date sent to the e-mail of the intended recipient as set forth in this Agreement (as evidenced by the senders "sent mail" mailbox and by the absence of a delivery failure message in the sender's "inbox") if sent or transmitted prior to 5:00 p.m. Arizona time, or otherwise on the next succeeding Business Day. Notice to a party shall not be effective unless and until each required copy of such Notice specified above (or as the parties may from time to time specify by notice in accordance with this Section) is given. The inability to deliver a Notice because of a changed address of which no Notice was given, or any rejection or other refusal to accept any Notice, shall be deemed to be the receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept. Any telephone numbers set forth above are provided for convenience only and shall not alter the manner of giving Notice set forth in this Section. Any Notice to be given by any party hereto may be given by legal counsel for such party. Notwithstanding the foregoing, if no email address is provided for a party above, then the date for delivery shall be extended by the number of days to effectuate alternate delivery of Notice so long as the Notice was transmitted on the date due.

14.5    Expenses.  Subject to the provision for payment of the Closing Costs in accordance with the terms of Section 7.6 of this Agreement and of any other provision of this Agreement, whether or not the transaction contemplated by this Agreement shall be consummated, all fees and expenses incurred by any party hereto in connection with this Agreement shall be borne by such party.

14.6    Severability.   Any provision or part of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall, as to such situation and such jurisdiction, be ineffective only to the extent of such invalidity and shall not affect the enforceability of the remaining provisions hereof or the validity or enforceability of any such provision in any other situation or in any other jurisdiction.

14.7    <u>Successors and Assigns</u>.  Neither party hereto may assign its rights or delegate its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding the foregoing, Buyer may assign this Agreement and its rights and obligations hereunder, with notice to Seller, but without obtaining Seller's prior written consent, so long as the assignment is to one of the following:  (a) a corporation, partnership, limited liability company or other entity that (i) controls, is controlled by, or under common control with Buyer or Buyer's parent company (including, without limitation, any partnership in which a general partner is, or any limited liability company whose manager, managing member, administrative member, or majority member is, Buyer or Buyer's parent company, or is controlled by or under common control with Buyer or Buyer's parent company), or (ii) results from the merger or consolidation with Buyer; (b) to a "landbanker" pursuant to a "landbanking" transaction in which the "landbanker" holds the Property as security or pursuant to an option agreement or purchase agreement or similar arrangement whereby Buyer has the right to acquire the Property from such landbanker; (c) another homebuilder of equal or greater financial strength as Buyer, or the wholly-owned subsidiary of such a homebuilder; or (d) a partnership, limited liability company, or other joint venture company between Buyer and (i) one or more of the legal entities described in subparagraph (a); and/or (ii) an institutional or other investor or group of investors that is one of Buyer's landbanking entities, or a partnership, limited liability company, or corporation that is wholly-owned, directly or indirectly, by such investor(s); and/or (iii) a homebuilder or subsidiary thereof as described in clause (c).  If Buyer assigns its rights under this Agreement pursuant to this <u>Section 14.7</u>, then unless such assignment is to a landbanker, such an assignment also shall be deemed a delegation of all of Buyer's duties pursuant to this Agreement, and except as otherwise provided in the instrument assigning the same, Buyer shall be relieved from all obligations, and the entity to which Buyer assigns its rights and delegates its duties under this Agreement shall be bound to perform, under this Agreement.

14.8    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Executed counterparts may be delivered via electronic mail or other similar transmission method, and any executed counterpart so delivered shall be valid and effective for all purposes.  Neither party shall raise the use of any electronic signature (including www.docusign.com), or the use of email or other similar transmission method as a means to deliver a signature to this Agreement or any amendment hereto as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

14.9    <u>Multiple Parties</u>.  In the event Seller consists of more than one person and/or entity and Seller defaults or is in breach of any of the terms of this Agreement, all of the persons and entities comprising Seller shall be jointly and severally liable for the performance and/or satisfaction of Seller's obligations under this Agreement.

14.10    <u>Headings</u>.   The Section headings of this Agreement are for convenience of reference only and shall not be deemed to modify, explain, restrict, alter, or affect the meaning or interpretation of any provision hereof.

14.11    <u>Time of Essence</u>.   Time shall be of the essence with respect to all matters contemplated by this Agreement.

14.12    Further Assurances.  In addition to the actions recited herein and contemplated to be performed, executed, and/or delivered by Seller and Buyer, Seller and Buyer agree to perform, execute, and/or deliver or cause to be performed, executed, and/or delivered at each Closing or after each Closing any and all such further acts, instruments, deeds, and assurances as may be reasonably required to consummate the transaction contemplated hereby.

14.13    Construction.  As used in this Agreement, the masculine, feminine, and neuter gender and the singular or plural shall each be construed to include the other whenever the context so requires.  This Agreement shall be construed as a whole and in accordance with its fair meaning, without regard to any presumption or rule of construction causing this Agreement or any part of it to be construed against the party causing the Agreement to be written.  The parties acknowledge that each has had a full and fair opportunity to review the Agreement and to have it reviewed by counsel. If any words or phrases in this Agreement have been stricken, whether or not replaced by other words or phrases, this Agreement shall be construed (if otherwise clear and unambiguous) as if the stricken matter never appeared and no inference shall be drawn from the former presence of the stricken matters in this Agreement or from the fact that such matters were stricken.

14.14    Attorneys' Fees.  If either party hereto brings an action or proceeding against the other party to enforce or interpret any of the covenants, conditions, agreements, or provisions of this Agreement, the prevailing party in such action or proceeding shall be entitled to recover all costs and expenses of such action or proceeding, including, without limitation, attorneys' fees, charges, disbursements, and the fees and costs of expert witnesses.  If any party secures a judgment in any such action or proceeding, then any costs and expenses (including, but not limited to, attorneys' fees and costs) incurred by the prevailing party in enforcing such judgment, or any costs and expenses (including, but not limited to, attorneys' fees and costs) incurred by the prevailing party in any appeal from such judgment in connection with such appeal shall be recoverable separately from and in addition to any other amount included in such judgment.  The preceding sentence is intended to be severable from the other provisions of this Agreement, and shall survive and not be merged into any such judgment.

14.15    Business Days.  As used herein, the term "**Business Day**" means a day that is not a Saturday, Sunday, or legal holiday.  If the date for the performance of any covenant or obligation under this Agreement shall fall on a Saturday, Sunday, or legal holiday, the date for performance thereof shall be extended to the next Business Day.  Similarly, if the day for the performance of any covenant or obligation under this Agreement involving Escrow Agent shall fall on a Business Day on which Escrow Agent is closed for business to the public, the date for performance thereof shall be extended to the next Business Day on which Escrow Agent is open for business to the public.

14.16    Intentionally Deleted.

14.17    Confidentiality.  Each party agrees that it will keep the terms of this Agreement and the transaction contemplated hereby strictly confidential.  Accordingly, prior to the Initial Closing, Seller and Buyer shall not disclose this Agreement or the terms hereof to any person who is not a party to this Agreement (other than the disclosing party's legal and financial advisors or other consultants or lenders and prospective assignees and such lenders' legal and financial advisors or other consultants and/or such prospective assignees' legal and financial advisors or other

33

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

consultants or lenders) without the prior consent of the other. Further, Buyer may disclose the terms of this Agreement and the transaction contemplated hereby in connection with seeking the Governmental Approvals, off-site easements and design other approvals related to the Property, and either party may disclose the terms of this Agreement and the transaction contemplated hereby in connection with the prosecution or defense of a legal action between the parties concerning this Agreement, or as otherwise required by law.

Signature page(s) follows(s).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Agreement Date.

**SELLER:**

**MCCONNELL ROAD SOUTH – GSO LLC,** a
North Carolina limited liability company

By: _____
Name: _____
Its: President

**BUYER:**

**MERITAGE HOMES OF THE CAROLINAS, INC.,** an Arizona corporation

By: _____
Name: RIC J. ROJAS
Its: Division President

*S-1*

**ESCROW AGENT:**

The undersigned Escrow Agent hereby accepts the foregoing Purchase and Sale Agreement and Joint Instructions, agrees to act as Escrow Agent under such agreement in strict accordance with its terms, agrees to insert as the "Agreement Date" on page 1 thereof, if not otherwise dated, the latest date such agreement was signed by Seller and Buyer.

Metro Title Company, LLC

By: _____

Name: David Hofstetler

Title: Manager

Date: 3 - 22 - 2022

**CLOSING AGENT:**

The undersigned Closing Agent hereby accepts the foregoing Purchase and Sale Agreement and Joint Instructions, agrees to act as Closing Agent under such Agreement in strict accordance with its terms, and agrees to comply with the applicable provisions of the Internal Revenue Code with respect to the transactions contemplated hereby.

Nexsen Pruet, PLLC

By: _____

Name: Keith D Burns

Title: Member

Date: 3.22.22

*S-1*

## LIST OF EXHIBITS

EXHIBIT "A"  DESCRIPTION OF THE LAND

EXHIBIT "B"  PRELIMINARY SITE PLAN

EXHIBIT "C"  FORM OF DEED

EXHIBIT "D"  FINISHED LOT CONDITION

EXHIBIT "E"  NON-FOREIGN AFFIDAVIT

EXHIBIT "F"  GENERAL ASSIGNMENT

EXHIBIT "G"  ASSIGNMENT OF WARRANTIES

EXHIBIT "H"  FORM OF DEED OF TRUST

EXHIBIT "I"  CLOSING AND PRICE ESCALATION SCHEDULE

EXHIBIT "J"  FORM OF INTERCREDITOR AGREEMENT

1

## EXHIBIT "A"

## DESCRIPTION OF THE LAND

### PIN P/O 8813749709, 8813638023, 8813634730

Beginning at an existing iron rod at the centerline intersection of Village Road, S.R. 3073 and McConnell Road, S.R. 3072, having a North Carolina State Plane Coordinate (Epoch 2011) value of North 835367.12 feet, East 1817428.32 feet. Thence with the centerline of McConnell Road N53° 45' 57"E, 29.59' to an existing nail; thence with a curve to the right having a radius of 2980.00' a length of 1024.12', and a chord bearing and distance of N63° 36' 40"E, 1019.09' to an existing nail; thence N73° 27' 23"E, 47.21' to an existing nail; thence with a curve to the right having radius of 2980.00', a length of 432.64', and a chord bearing and distance of : N77° 36' 36"E, 432.26' to an existing nail; thence N81° 46' 29"E, 637.05' to an existing nail; thence leaving McConnell Road S1° 17' 17"W, 1290.13' to a 5/8" capped rebar set; thence S1° 17' 17"W, 1147.26' to a 5/8" capped rebar set, witness by an existing iron rod which bears  S 87° 16' 06"E, 5.22'; thence N87° 16' 06"W, 1314.38' to an existing planted rock; thence S28° 12' 53"W, 909.65' to an existing iron rod; thence S34° 07' 15"W, 939.49' to an existing iron rod; thence N79° 59' 33"W, 560.70' to an existing iron rod; thence S12° 17' 49"W, 402.46' to an existing iron rod; thence N83° 15' 40"W, 665.58' to an existing iron pipe; thence N83° 38' 42"W, 98.94' to an existing iron pipe; thence N83° 34' 22"W, 95.68' to an existing iron pipe' thence N4° 35' 46"E, 263.44' to an existing iron pipe; thence N83° 35' 15"W, 169.81' to an existing iron pipe; thence N2° 48' 04"E, 398.60' to an existing iron pipe; thence N2° 44' 11"E, 124.48' to an existing iron pipe; thence S88° 38' 24"E, 628.19' to an existing iron pipe; thence N2° 47' 04"E, 859.39' to a 5/8" capped iron rod set; thence N04° 23' 00"E, 4.95' to an existing iron pipe; thence N22° 23' 56"E, 434.48' to a 5/8" capped iron rod set; thence  S87° 04' 38"E, 100.81' to a 5/8" capped iron rod set; thence N8° 43' 52"E, 619.22' to a nail set in the centerline of McConnell Road; thence with a curve to the right having a radius of 862.44', a length of 26.81', and a chord bearing and distance of N39° 54' 40"E, 26.81' to a point; thence N39° 01' 14"E, 283.70' to a point; thence with a curve to the right having a radius of 1978.32', a length of 498.34', and a chord bearing and distance of N46° 14' 14"E, 497.03' to a point; thence N53° 32' 35"E, 397.07' to the Beginning. Containing 195.380 acres more, or less, and containing the properties having the following North Carolina Parcel Identification Numbers: P/O 8813749709, 8813638023, 8813634730

A-1-1

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

**EXHIBIT "B"**

**PRELIMINARY SITE PLAN**



| SOUTH | |
|---|---|
| 21'/24' TOWNHOMES | 208 |
| 41' SF | 386 |
| 51' SF | 191 |
| TOTAL | 785 |

**McCONNELL ROAD SOUTH**
Conceptual Development Plan - February 21, 2022

COUNTY SITE PLAN #:
COUNTY PROJECT #:

B-1

# EXHIBIT "C"

## FORM OF DEED

| Excise Tax $_____ | Recording Time, Book and Page |
|---|---|

Tax Lot No.: _____ Parcel Identifier No. _____
Verified by _____ County on the _____ day of _____, 20_____
by _____
Mail after recording to Grantee
This instrument was prepared by _____
Brief Description For The Index:

## NORTH CAROLINA SPECIAL WARRANTY DEED

**THIS DEED** made this _____ day of _____, 20__, by and between:

| GRANTOR | GRANTEE |
|---|---|
| _____<br><br>_____<br>_____<br>_____ | **MERITAGE HOMES OF THE CAROLINAS, INC.**, an Arizona corporation<br>8800 East Raintree, Suite 300<br>Scottsdale, Arizona 85260<br>Attention: Darrell S. Husband |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g. corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

**WITNESSETH**, that Grantor, for a valuable consideration paid by Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey, that certain real property described on Exhibit "A" attached hereto and incorporated herein by this reference (the "**Land**"), together with all of Grantor's interest in (a) all buildings, structures, and improvements located thereon; (b) all development rights and credits, air rights, water, water rights, and water stock, all development rights and credits, impact fee credits, prepaid fees (including, without limitation, sewer, water and impact fees paid to the County), water capacity, sewer, wastewater and reuse water rights, sewage treatment capacity, other utility capacity and rights, capacity certificates, approvals, and permits relating to any of the Land; (c) all right, title, and interest of Grantor in and to all appurtenant strips and gores, streets, alleys, easements, rights-

C-1

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

of-way, public ways, or other rights appurtenant, adjacent, or connected to any of the Land; (d) minerals, oil, gas, and other hydrocarbon substances therein, thereunder, or that may be produced therefrom; and (e) any other rights, privileges, appurtenances, hereditaments, easements, reversions, and remainders pertaining solely thereto or used in connection therewith (collectively, the "**Property**").

The Property was acquired by Grantor by instrument recorded in Book _____, at Page _____, _____ County Public Registry.

The Property is conveyed subject to the easements, restrictions, reservations, covenants, conditions and other exceptions set forth on Exhibit "B" attached hereto and incorporated herein by this reference (collectively, "**Permitted Exceptions**").

**TO HAVE AND TO HOLD**, subject to the Permitted Exceptions, the Property and all privileges and appurtenances thereto belonging to Grantee in fee simple.

Subject to the Permitted Exceptions, Grantor covenants with Grantee, that Grantor has done nothing to impair such title as Grantor received, and Grantor will warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor.

[Signature Page Follows]

C-2

**IN WITNESS WHEREOF**, Grantor executed this deed as of the day and year first above written.

**MCCONNELL ROAD SOUTH – GSO, LLC**,
a North Carolina limited liability company


By:_____
Name: _____
Title: _____



STATE OF _____
COUNTY OF _____

I certify that _____ personally appeared before me this day, acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated.

Witness my hand and official seal, this the _____ day of _____, 20 ____.
(Official Seal)


_____
Notary Public


My commission expires: _____

C-3

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

EXHIBIT "A" TO SPECIAL WARRANTY DEED

Legal Description

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

<u>EXHIBIT "B" TO SPECIAL WARRANTY DEED</u>

<u>Permitted Exceptions</u>

C-5

# EXHIBIT "D"

## FINISHED LOT CONDITION

For purposes of the Agreement, the term "**Finished Lot condition**" shall mean a Lot which is suitable for the issuance of a residential building permit, and which satisfies all of the conditions described below to Buyer's reasonable discretion:

**1.** **General Obligations.**

Seller, at Seller's expense, shall develop the Lots so that all Lots will have the following improvements (collectively, "**Improvements**") properly installed or constructed and actions accomplished in regard to the same (hereinafter, the "**Development Work**"), which Improvements and Development Work shall be performed and installed by Seller in accordance with the Governmental Approvals in all material respects and as provided for in the construction plans associated with the Lots that have been or will be approved as provided in the Governmental Authorities (the "**Approved Plans**").

Seller shall complete all Development Work in a good and workmanlike manner and in accordance with the Approved Plans. All materials used for the Development Work shall comply with the requirements of the Approved Plans and the Governmental Approvals. Seller shall, at its expense, obtain and post all bonds and other security necessary or required for completion of the Development Work by any Governmental Authority or by any utility company for utilities that will be serving the Community and, if off-site work is contemplated by the Approved Plans, Seller shall complete and pay all costs associated with the completion of the off-site Development Work.

Notwithstanding anything to the contrary contained in this Agreement, the only responsibilities of Buyer in regard to any infrastructure improvements pertaining to the Community shall be only those responsibilities which are expressly accepted by Buyer in this Agreement and, to the extent any infrastructure improvements pertaining to the Property do not fall within the express responsibilities of Buyer, such infrastructure improvements shall be the responsibility of Seller.

Seller shall not be deemed to have completed the Development Work unless and until (i) all work and Improvements described herein are completed in accordance with the requirements herein and in the Approved Plans, (ii) the Final Plat for any Lots has been recorded by the Governmental Authorities, and (iii) Seller has completed all Punch List repair items applicable to such Lots, if any. Seller shall provide to Buyer copies of any correspondence from any Governmental Authorities evidencing the completion of the Development Work and, upon the request of Buyer, Seller shall make available to Buyer any other reasonable documentation related to the completion of the Development Work.

**2.** **Finished Lots.** The Improvements to be installed and the Development Work to be completed by Seller on each Lot prior to Closing (or sooner if required by Governmental Authorities in connection with the Governmental Approvals) are as follows:

    (a)    Sewer Service. Operational public sanitary sewer with a tee connection shall be brought to a point within each Lot which is located no more than two feet (2') out from the boundary of the public right-of-way, and no deeper than forty-eight inches (48") unless otherwise mutually agreed. The sanitary sewer main serving each Lot shall have been constructed in accordance with the Approved Plans to a condition sufficient for Buyer to

obtain a building permit for the Lot and, upon Buyer's completion of a new home thereon (hereinafter, a "**Dwelling Unit**"), a certificate of occupancy therefore. All sewer mains shall be located in a public or private right-of-way adjacent to each Lot, and, if required by the Approved Plans, any applicable off-site sewer extensions shall be installed and operational and all fees applicable thereto paid in full by Seller. Seller shall clearly mark the location of all sewer laterals at the boundary line of each Lot. Seller shall coordinate with Buyer to install sewer laterals outside of proposed driveway and sidewalk locations either shown on the Approved Plans or as identified by Buyer to Seller prior to the installation thereof. Buyer will coordinate with the appropriate utility company for the installation of secondary sewer service to each of the Dwelling Units to be constructed on each of the Lots, and while Seller shall pay prior to each Closing any fees payable in connection with such primary service to any utility company in connection with such service, Buyer shall be solely responsible for paying all "tap" fees or capacity fees to the utility company associated with obtaining sewer service to the Dwelling Unit.

(b)   <u>Water Service</u>. Operational public water mains with a tee connection to a point within each Lot. The public water main serving a Lot shall have been constructed in accordance with the Approved Plans to a condition that is sufficient for Buyer to obtain a building permit for the Lot and, upon Buyer's completion of a Dwelling Unit thereon, a certificate of occupancy therefore. All such water mains shall be located in a public or private right-of-way adjacent to each Lot, and, if required by the Approved Plans, any applicable off-site water extensions shall be installed and operational and all fees applicable thereto paid in full by Seller. Seller shall clearly mark the location of all water laterals at the boundary line of each Lot. Seller shall install a curb box or meter vault (as applicable) for the water service for each Lot. Seller shall coordinate with Buyer to install water service boxes outside of proposed driveway and sidewalk locations either shown on the Approved Plans or as identified by Buyer to Seller prior to the installation thereof. Buyer will coordinate with the appropriate utility company for the installation of secondary water service to each of the Dwelling Units to be constructed on each of the Lots, and while Seller shall pay prior to each Closing all fees payable in connection with such primary service to any utility company in connection with such service, Buyer shall be solely responsible for paying all "tap" fees or capacity fees to the utility company associated with obtaining water service to the Dwelling Unit.

(c)   <u>Utilities</u>. Seller shall, at its expense, coordinate and facilitate the installation of underground electric, telephone, natural gas, internet and television cable lines for the Community and each Lot as will be necessary to service the Dwelling Unit to be constructed on such Lot (collectively, the "**Utilities**") in accordance with the Approved Plans and to a condition that is sufficient for Buyer to obtain a building permit for the Lot and, upon Buyer's completion of a Dwelling Unit thereon, a certificate of occupancy therefore. Buyer will coordinate with the appropriate utility company for the installation of secondary service for the Utilities to each of the Dwelling Units to be constructed on each of the Lots; but Seller shall pay prior to the Closing all fees payable in connection with such primary service to any utility company in connection with such service. If the installation of any Utilities is delayed, in any material respect, due to the actions of Buyer or any of Buyer's subcontractors, then Buyer will bear the burden and expense of any repairs needed to the work performed by Seller, if any.

D-2

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

(d)    Storm Drains.  All storm drainage systems, storm sewers and other drainage facilities serving each Lot shall be installed by Seller in accordance with the Approved Plans. Seller shall coordinate with Buyer to install catch basins and inlets outside of proposed driveway locations shown on the Approved Plans or as identified by Buyer to Seller prior to the installation thereof.

(e)    Roadways and Parking Areas.  Curbs, gutters, curb cuts (but not driveways or driveway aprons, which shall be installed by Buyer at its sole expense), streets, roads, alleys, including access to a public thoroughfare, and, if applicable, parking areas for common areas, serving a Lot shall be installed by Seller as shown on the Approved Plans, however Seller may use valley curb for any private streets. Except as otherwise provided herein or in the Agreement, final completion of any particular road improvements by Seller shall not be deemed to be a condition precedent to Buyer's obligation to close on any particular Lot unless such incompletion would prohibit Buyer's ability to obtain a building permit for a Dwelling Unit on such Lot or a certificate of occupancy for the Dwelling Unit constructed thereon.

(f)    Sidewalks.  Seller shall install all sidewalks as shown on the Approved Plans, except for those that are located (i) within the boundaries of any Lot acquired by Buyer hereunder or (ii) in front of or adjacent to the Lot lines of any Lot acquired by Buyer hereunder which shall include, without limitation, all road frontage areas of any corner Lots. Buyer shall install all driveways and driveway aprons on the Lots it purchases.  Seller shall also install the sidewalks in the common areas of the Community, including, but not limited to, any connecting sidewalks.  Except as otherwise provided herein or in the Agreement, the completion of any particular common area sidewalks by Seller shall not be deemed to be a condition precedent to Buyer's obligation to close on any particular Lot unless such incompletion would prohibit Buyer's ability to obtain a building permit for a Dwelling Unit on such Lot or a certificate of occupancy for the Dwelling Unit constructed thereon.

(g)    Clearing, Grading and Compaction.

(i)   The Lot contains a building pad graded and compacted to 2,500 psf, as certified by a professional engineer, and in a condition suitable for the construction of the applicable Dwelling Unit thereon in compliance with the Approved Plans.

(ii)  The Lot has been graded with the minimum surface grade required for surface drainage as designated on the Approved Plans, with the high point in swale adjacent to the building pad 0.5' below pad elevation, and drainage at 2% in all directions, all in accordance with the Approved Plans.

(iii) Lots with slab on grade foundations shall be constructed in accordance with the Approved Plans, which Buyer will work with Engineer to design according to Buyer's specifications including, without limitation, a maximum driveway slope of 10%. Once complete, each Lot shall be surveyed by a licensed surveyor in a manner acceptable by the design engineer including field run topography and LIDAR to ensure pad grading has been completed per the Approved Plans.   Building pad as-builts for each Lot shall be provided to the Buyer.

(iv)  Driveways will be designed in accordance with the Approved Plans.

D-3

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

(v) Seller shall cause the engineer of record to certify to Buyer the foregoing standards in clauses (i) through (iv) have been met with respect to each Lot or phases of Lots once completed.

(vi) After Closing and Buyer's completion of the Dwelling Unit thereon, Buyer's fine grading of any Lots shall be done in accordance with the Approved Plans and at Buyer's sole expense.

(h) <u>Storm Water Management</u>.  Seller shall design, construct, maintain and operate all storm water management and temporary sediment control facilities to include silt fence, seed & straw, disturb areas, and drop inlet and/or catchbasin rockbags necessary to service the Community; provided, however, that Buyer shall be responsible for promptly repairing any damage caused to such facilities by Buyer or any of its contractors, and if Buyer fails to make sure repairs after demand by Seller, then Seller shall have the right to perform such repairs at Buyer's expense and Buyer shall reimburse Seller upon demand for its costs incurred to complete such repairs (which obligation shall survive the termination of this Agreement).  Upon request, Seller shall promptly provide Buyer with complete copies of, or prompt access to, any amendments thereto, and copies of, or access to, any and all stormwater plans and permits obtained by Seller related to the Lots and any Stormwater Pollution Prevention Plan prepared by or for Seller (the "**SWPPP**").  Seller shall indemnify, defend and hold Buyer harmless for, from and against all actions, liabilities, and expenses (including without limitation, reasonable attorneys' fees and court costs) incurred by Buyer as a result of Seller's failure to comply with the provisions of the SWPPP, the generic permit for stormwater discharge from large and small construction activities administered by any government agency under the National Pollutant Discharge Elimination System ("**NPDES**") or other applicable governmental requirements, provided, in any such case, such failure was not caused by or attributed to acts or omissions of Buyer or its contractors, which obligation shall survive any termination of this Agreement and the Closings.  At any time, and from time to time, when such storm water management or temporary sediment control facilities are no longer necessary for the Community, Seller shall convert such facilities to permanent devices, backfill (and if located within a building pad within a Lot, shall compact the soils to 95% of standard proctor) and fully stabilize the areas comprising the same, as and to the extent required in the Approved Plans and otherwise in accordance with the NPDES permit and the SWPPP.  Seller shall remain responsible for the design, construction, maintenance and operation of all such storm water management and temporary sediment control facilities until (i) the date upon which the appropriate Governmental Authority accepts responsibility for the permanent devices or backfilled and stabilized areas to which such facilities have been converted, in accordance with any and all governmental or quasi-governmental procedures provided to effectuate such acceptance, or (ii) the date upon which the Association accepts responsibility for the permanent devices or backfilled and stabilized areas to which such facilities have been converted. Buyer shall be solely responsible for the installation and maintenance of all on-Lot erosion and sediment control measures pertaining to each Lot after a Closing with respect thereto (and any liability associated therewith) and for ensuring that such measures remain in compliance with the SWPPP and the stormwater permits and approvals applicable thereto and, in order to confirm such responsibility, promptly after

D-4

the Closing, Buyer shall deliver to the applicable Governmental Authorities a "certificate of coverage" (or similar document) whereby Buyer assumes financial responsibility for the erosion and sediment control of the Lots that are subject to such Closing. Buyer's responsibility for such on-Lot controls shall continue until final stabilization of such Lot and Buyer transfers the Lot to a homebuyer. Buyer shall be responsible for the removal of on-Lot erosion and sediment control facilities (specifically excluding temporary traps and storm water management ponds) at the time of stabilization of such Lot. Buyer shall also be responsible for the cleanup of any sediment or debris from Buyer's Lots or otherwise caused by Buyer,

(i)    Engineering Controls. Seller shall set pins on each corner of each Lot in the location identified on the Final Plat for such Lot.

(j)    Entitlement to Permit. Development of each Lot shall be completed by Seller to an extent sufficient for Buyer to obtain its building permit (upon payment of any fees by Buyer associated therewith) and, upon Buyer's completion of a Dwelling Unit thereon, a use and occupancy permit, or similar permits from any and all Governmental Authorities having jurisdiction thereover for the construction, completion, use and occupancy of the Dwelling Unit contemplated to be constructed on the Lot.

**3.    Development Work.** In performing the Development Work, Seller covenants and agrees to the following:

(a)    There shall be no borrow pits, burial pits or berms on any Lot without Buyer's approval.

(b)    Except as provided in Section 5(e) below, there shall be no buried rock, organic material or debris of any nature on any building pad within a Lot.

(c)    All garbage and debris must be hauled off each Lot.

(d)    All retention or detention ponds shall be designed as determined by the applicable Governmental Authorities and as provided by the Approved Plans.

(e)    With regard to slopes on any Lot: (i) the slopes on the Lots shall be graded in accordance with the Approved Plans and the tolerances therefore permitted by the Governmental Authorities, but not to exceed (under any circumstances) a ratio of 3:1; and (ii) slopes shall not contain any organics, spoils or other unsuitable material, and shall have a proper footing.

(f)    Dedication. Seller shall cause all roads shown on the Final Plat and Approved Plans, and all other improvements, to the extent the same are intended to be public, to be transferred to the applicable Governmental Authorities and accepted for maintenance by the applicable Governmental Authorities as soon as reasonably practicable after taking into account on-going construction and other activities occurring within the Community. Seller shall also cause all common and open space, as well as any park areas, entrance features and landscape buffers and easements to be transferred to the Association once completed.

(g)    Landscaping and Signage. Seller shall be required to install and complete all common area landscaping, hardscape and entry monuments in accordance with the Approved Plans, and each such feature shall be completed and delivered in conjunction with the

Closing of each corresponding Phase in accordance with the Closing Schedule attached as Exhibit I to the Agreement. Buyer's sole obligations with respect to any landscaping within the Property shall be limited to installation of any landscaping required by any Governmental Authority and shown on the Approved Plans to the extent such landscaping is to be located within either the boundaries of any Lot acquired by Buyer hereunder or along the right-of-way in front of or adjacent to such Lot between it and the street/roadway, including any trees which are "street" trees or in lieu of "street" trees, designated by any Governmental Authority to be planted within the boundaries of or immediately adjacent to any Lot.

(h)   Amenities. Seller shall design (with final designs and construction plans acceptable to Buyer, in its commercially reasonable discretion) and shall construct the following amenities on the Land which shall be sized appropriately to serve all residents of the Community: (i) swimming pool, (ii) clubhouse, (iii) playground, (iv) pocket parks, and (v) walking trails (collectively, the "**Amenities**"), all in accordance with the Approved Plans, for which a minimum budget of $2,000,000 shall be allocated and committed by Seller, and for which a maximum of 190 residents from outside of the Community (from the Excluded North Parcels) shall be permitted to join through membership in the Association. Seller shall cause the Amenities to be substantially completed by May 15, 2024.

(i)   Streets.  All streets abutting the Lots subject to each Closing shall have been completed and improved in accordance with the Approved Plans, with the exception of final lift of asphalt, and provide for uninterrupted and unimpeded access between the Lots and public streets located outside the Property.  Final lift of asphalt shall be installed as instructed by the City of Greensboro.

(j)   Street Lights.  Prior to the Initial Closing, Seller shall provide evidence that Seller has taken all appropriate action to cause the installation of all street lights serving the Community and the Lots to be completed as and when required by the Governmental Authorities, and at Seller's sole expense.

(k)   Street Signs.  Seller shall cause the installation of street signs for any completed streets within the Property and take any other steps required by any Governmental Authority with respect to the addresses for the Lots served thereby if required for Buyer to obtain a building permit for a Lot; however, in all such events Seller shall cause the installation of street signs and the required notices to be given before Buyer's need for a certificate of occupancy for a Dwelling Unit on any Lot served thereby.

(l)   Mailboxes. Seller shall design the community mailbox area(s) and install the concrete pad(s) for the community mailboxes, the mailbox receptacles, and any required parking areas in accordance with the Approved Plans.

(m)   Retaining Walls.  Seller shall install all retaining walls required to be constructed in accordance with the Governmental Approvals and as shown on the Approved Plans, whether located on lot or off lot.

(n)   Final Improvements.  In addition to, and without limiting, the obligations set forth above, Seller shall (a) upon completion of its Development Work, promptly cause the removal from the Property of all trash and debris related to Seller's Development Work, and (b)

construct any recreational structures or amenities shown on the Approved Plans, if any, before the applicable deadline therefore in the Governmental Approvals.

(o)    Final Lien Waivers. Unconditional final waivers and releases of mechanics' and materialmen's liens shall have been obtained upon final payment from all contractors, subcontractors, and material suppliers that constructed works of improvement, performed other work, or supplied materials (whether on-site or off-site) in connection with satisfying the conditions (imposed by this Agreement or otherwise) necessary to bring the Lots to a Finished Lot Condition.

4.    **Community Security**.  Seller shall post any required subdivision letters of credit, surety bonds, or cash security required by any Governmental Authorities in connection with the development of the Community; provided, however, that Buyer shall post any bond(s) required in connection with the sidewalks and/or "street" trees to be installed in front of or adjacent to the Lots as required hereunder or in the Approved Plans (but not the common areas or open spaces, which shall be Seller's responsibility).

5.    **Additional Stipulations**.  The following shall be complied with prior to Closing:

(a)    All Lots shall be delivered by Seller to Buyer at the applicable Closing, free of debris, trash, and wood chips, and fully stabilized with any disturbed areas seeded or with a stand of grass in place.

(b)    Any utility rebates applicable to payments made by Buyer and received by Seller shall be rebated to Buyer once received by Seller.

(c)    No portion of any building pad of a Lot will be located within a flood plain, buffer wetlands, jurisdictional waters or special flood hazard area as indicated by any map or plat issued or controlled by FEMA, the Federal Insurance Administration, or any other federal, state, or local agency.

(d)    In the event that Buyer, within one (1) year following the date of any Closing for a Lot, through no fault of Buyer, discovers the Lot is not in Finished Lot Condition for reasons other than the existence of rock on the Lot (which rock condition shall instead be governed by Section 5(e) below), then the Lot shall be deemed a "**Defective Lot**" and Buyer shall promptly notify Seller in writing.  Seller shall respond in writing to Buyer within five (5) Business Days of receipt of Buyer's notification to confirm whether or not Seller agrees, in Seller's commercially reasonable discretion and in good faith, that the Lot is a Defective Lot. If the Lot is a Defective Lot, Seller shall have sixty (60) days from the date of Seller's written response to cure the Defective Lot by causing the Defective Lot to satisfy the Finished Lot Condition.  Seller understands that time is of the essence in curing the Defective Lot and shall use reasonable and diligent efforts to cure the Defective Lot as soon as is reasonably possible.  If, however, Seller reasonably disagrees with Buyer, in good faith, as to whether any individual Lot is a Defective Lot, the Parties agree to engage a mutually agreeable third-party engineer to evaluate and determine whether or not the applicable Lot is a Defective Lot based upon the conditions identified by Buyer, and the Parties agree that such determination by the third-party engineer shall be final with respect to the applicable Lot. The foregoing provisions shall survive the Closing.

(e)     Seller shall provide Lots free of rock below pad elevation so as not to obstruct the installation of sewer lines, water lines, foundations, and/or other utilities. Any cost incurred in the removal of rock in order to provide for the installation of the foregoing items shall be reimbursed by Seller, which reimbursement obligation shall survive the Closing.

D-8

# EXHIBIT "E"

## FORM OF NON-FOREIGN AFFIDAVIT

### NON-FOREIGN AFFIDAVIT

STATE OF _____ )
                                    ) ss.
County of _____ )

The undersigned, as authorized agent of _____, a(n) _____ _____ ("**Transferor**"), after being duly sworn upon his oath deposes and says that:

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform MERITAGE HOMES OF THE CAROLINAS, INC., an Arizona corporation ("**Transferee**"), that withholding of tax is not required upon the disposition of Transferor's interest in a U.S. real property interest, the undersigned hereby certifies the following:

1. Transferor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust, foreign estate, or other foreign person within the meaning of § 1445 and § 7701 of the Internal Revenue Code and the treasury regulations promulgated thereunder;

2. Transferor is not a disregarded entity as defined in Treas. Reg. § 1.1445-2(b)(2)(iii);

3. Transferor's U.S. taxpayer identification number is: _____;

4. Transferor's business address is: _____
_____
_____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury Transferor declares that it has examined this certification and to the best of its knowledge and belief this certification is true, correct, and complete. The undersigned agent declares that he has the authority to sign this document on behalf of Transferor.

### TRANSFEROR:

_____

By: _____
Name: _____
Its: _____

E-1

STATE OF _____
COUNTY OF _____

I certify that _____ personally appeared before me this day, acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated.

Witness my hand and official seal, this the _____ day of _____, 20 _____.
(Official Seal)


_____
Notary Public


My commission expires: _____

E-2

## EXHIBIT "F"

## FORM OF GENERAL ASSIGNMENT

## GENERAL ASSIGNMENT

THIS GENERAL ASSIGNMENT (this "**Assignment**") is executed as of the ___ day of _____, _____, by _____, a(n) _____ ("**Assignor**"), to and for the benefit of MERITAGE HOMES OF THE CAROLINAS, INC., an Arizona corporation ("**Assignee**").

WHEREAS, contemporaneously herewith, Assignee is acquiring from Assignor certain real property described in Exhibit "A" attached hereto (the "**Land**"), together with all of Assignor's right, title, and interest in and to: (a) all buildings, structures, and improvements thereon (the "**Improvements**"); and (c) all of the rights, privileges, appurtenances, hereditaments, easements, reversions, and remainders pertaining to or used in connection with the Land and/or any of the Improvements, including, without limitation, all (i) development rights and credits, air rights, water, water rights, water stock, water capacity, sewer, wastewater and reuse water rights, sewage treatment capacity, other utility capacity and rights, capacity certificates, approvals, and permits relating to the Land, (ii) strips and gores, streets, alleys, easements, rights-of-way, public ways, or other rights appurtenant, adjacent, or connected to the Land, and (iii) minerals, oil, gas, and other hydrocarbon substances, geothermal resources, and wind rights in, on, over, under, or that may be produced from the Land (collectively, the "**Real Property**");

WHEREAS, in connection with the foregoing acquisition, Assignor desires to transfer and assign to Assignee all of Assignor's right, title, and interest, if any, in and to certain items and rights applicable or relating thereto, all as hereinafter provided.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby grants, sells, transfers, and assigns unto Assignee all of Assignor's right, title, and interest in and to intangible property owned by Assignor or used by Assignor exclusively in connection with all or any portion of the Real Property, if any, including, without limitation, all of Assignor's right, title, and interest, if any, in and to: (a) all existing and/or first draft plats, maps, site plan, improvement plans, drawings and specifications, including any CAD files, and development rights and credits and pre-paid fees relating to the Real Property (including, without limitation, sewer, water and impact fees paid to the City or the County), (b) all books, records, reports, test results, environmental assessments, if any, as-built plans, specifications, and other similar documents and materials relating to the use, operation, maintenance, repair, construction, or fabrication of all or any portion of the Real Property; (c) all transferable business licenses, architectural, site, landscaping or other permits, applications, approvals, authorizations, and other entitlements affecting any portion of the Real Property; and (d) all transferable guarantees, warranties, and utility contracts relating to all or any portion of the Real Property, and Assignor agrees not to release, waive, or alter the liability of any persons providing such guarantees or warranties from and after the date of this Assignment.

This Assignment is binding upon the successors and assigns of Assignor and will inure to the benefit of the successors and assigns of Assignee.

F-1

Assignor represents and warrants to Assignee that Assignor has not previously made an assignment of the matters set forth herein and Assignor hereby covenants that it will, at any time and from time to time upon written request therefor, execute and deliver to Assignee, and its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to evidence the assignment contained herein.

This Assignment shall be governed by and interpreted under the laws of the State of North Carolina, without regards to its principles of conflict of laws.

**ASSIGNOR:**

_____

By:_____
Name:_____
Its:_____

F-2

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

EXHIBIT "A" TO GENERAL ASSIGNMENT

Legal Description

F-3

## EXHIBIT "G"

## ASSIGNMENT OF WARRANTIES

THIS ASSIGNMENT OF WARRANTIES (this "**Assignment**") is executed as of the ___ day of _____, 20__, by _____, a _____ ("**Assignor**"), to and for the benefit of **MERITAGE HOMES OF THE CAROLINAS, INC.**, an Arizona corporation ("**Assignee**").

WHEREAS, contemporaneously herewith, Assignee is acquiring from Assignor certain real property described in Exhibit A attached hereto (the "**Property**"); and

WHEREAS, in connection with the foregoing acquisition, Assignor desires to transfer and assign to Assignee, on a non-exclusive basis, all of Assignor's right, title, and interest in and to all guarantees and warranties contained in those certain contracts (the "**Contracts**"), plans, specifications, plats and surveys identified on Exhibit B attached hereto, to the extent that they relate to the Property, (the "**Warranties**").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee, on a non-exclusive basis, all right, title and interest of Assignor in and to the Warranties. Assignor shall indemnify, defend and hold harmless Assignee for, from, and against any and all claims, obligations, demands, suits, actions, damages, liabilities, judgments, losses, costs, and expenses (including, without limitation, reasonable attorneys' fees) ("**Claims**"), arising out of, or related to, any breach or default by Assignor under the Contracts, excluding any Claims to the extent caused by the negligent acts or willful misconduct of Assignee.

This Assignment is binding upon the successors and assigns of Assignor and will inure to the benefit of the successors and assigns of Assignee.

Assignor hereby covenants that it will, at any time and from time to time upon written request therefor, without cost or expense to Assignor, execute and deliver to Assignee, and its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to evidence the assignment contained herein.

This Assignment shall be governed by and interpreted under the laws of the State of North Carolina, without regard to its principles of conflict of laws.

**ASSIGNOR:**

_____

By:_____
Name:_____
Its:_____

G-1

## EXHIBIT "H"

## FORM OF DEED OF TRUST

**After recording return to:**

**This instrument prepared by:**

| Brief description for the index: | |
|---|---|

### NORTH CAROLINA DEED OF TRUST, COLLATERAL ASSIGNMENT AND FIXTURE FILING

### SECURING FUTURE ADVANCES

THIS DEED OF TRUST, COLLATERAL ASSIGNMENT AND FIXTURE FILING [SECURING FUTURE ADVANCES] is made and given this ____ day of _____, 20____, by and between:

| **GRANTOR:** | **TRUSTEE:** | **BENEFICIARY:** |
|---|---|---|
| _____ <br><br> _____ <br><br> _____ | **METRO TITLE COMPANY** <br><br> 726 North Blount Street <br> Raleigh, NC 27604 <br> ATTN: David Huffstetler | **MERITAGE HOMES OF THE CAROLINAS, INC.**, an Arizona corporation <br><br> 3300 Paramount Pkwy, Suite 120 <br> Morrisville, NC 27560 <br> Attn: Ric Rojas |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g. corporation or partnership.

The designation Grantor, Trustee, and Beneficiary as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, Grantor, as seller, and Beneficiary, as buyer, are parties to that certain Purchase and Sale Agreement and Joint Instructions dated _____ , 2021 (as amended from time to time, the "**Agreement**"), the terms of which are incorporated herein, pursuant to which Grantor is to convey to Beneficiary that certain tract or parcel of property described on **Exhibit A** attached hereto and incorporated herein by reference (the "**Encumbered Property**"). This Deed of Trust is given by Grantor pursuant to the Agreement to secure (a) Grantor's obligation to return and/or credit the Deposit, as defined in and set forth in the Agreement and in the aggregate amount of $6,177,651.00; (b) Grantor's obligation to return, repay or credit funds advanced or expended by Beneficiary in accordance with the Agreement to perform certain development obligations with respect to the Property at the expense of Grantor, as applicable and as more fully set forth in the Agreement (the "**Development Obligations**"); and (c) any funds advanced by Beneficiary pursuant to and in accordance with that certain Intercreditor Agreement entered concurrently herewith (hereinafter, the "**Intercreditor Agreement**") by and among Grantor, Beneficiary and TIG ROMSPEN US MASTER MORTGAGE LP (hereinafter, the "**Senior Lender**"). This Deed of Trust is given in whole or in part to secure any future advances made by Beneficiary to Grantor in furtherance of Grantor's obligation to perform the Development Obligations in accordance with the Agreement and/or to Senior Lender pursuant to the Intercreditor Agreement, which obligations may arise following the date this Deed of Trust. The amount secured by this Deed of Trust shall in no event exceed $50,000,000.00 at any one time. No advances shall be made by Beneficiary, and no obligations of Grantor shall arise, following the date which is thirty (30) years following the date this Deed of Trust is recorded in the Office of the Register of Deeds in the county in which the Encumbered Property is situated.

H

NOW, THEREFORE, as security for such sums and costs of collection related to the Deposit and the Development Obligations and other valuable consideration, the receipt of which is hereby acknowledged and for the benefit of Beneficiary, Grantor has bargained, sold, given, granted and conveyed and does by these presents bargain, sell, give, grant and convey to said Trustee, his heirs, or successors, and assigns, to be held in trust for the benefit of Beneficiary, the "**Property**" which includes all below-described property, including real property, personal property and fixtures:

1. The Encumbered Property; and

2. All (A) plans and specifications for the Development Obligations to be constructed by Grantor on the Encumbered Property; (B) contract rights, construction contracts, and engineering agreements related to the Development Obligations; (C) permits, licenses, certificates, development rights, commitments and rights for utilities, and other rights and privileges obtained in connection with the Development Obligations and the Encumbered Property; and (D) engineering and other technical or business data concerning the Development Obligations which are in the possession of Grantor or in which Grantor can otherwise grant a security interest; and

3. All (A) proceeds of or arising from the properties, rights, titles and interests referred to above, including but not limited to proceeds of any sale, lease or other disposition thereof, proceeds of each policy of insurance relating thereto (including premium refunds), proceeds of the taking thereof or of any rights appurtenant thereto, including change of grade of streets, curb cuts or other rights of access, by eminent domain or transfer in lieu thereof for public or quasi-public use under any law, and proceeds arising out of any damage thereto; and (B) other interests of every kind and character which Grantor now has or hereafter acquires in, to or for the benefit of the properties, rights, titles and interest referred to above in this Section and all property used or useful in connection therewith, including but not limited to rights of ingress and egress and remainders, reversions and reversionary rights or interests, and development and declarant realty.

TO HAVE AND TO HOLD said Property with all privileges and appurtenances thereunto belonging to said Trustee, its heirs, successors, and assigns forever, upon the trusts, terms and conditions, and for the uses hereinafter set forth.

Without limitation, Grantor does further hereby grant to Beneficiary a security interest in all of the Property which constitutes personal property or fixtures (herein sometimes collectively called the "**Collateral**") (such that, in addition to its rights hereunder or otherwise, Beneficiary shall have all of the rights of a secured party under North Carolina law, and/or under the Uniform Commercial Code to the extent applicable).

If Grantor shall comply with all of the covenants, terms and conditions of the Agreement and this Deed of Trust, then this conveyance shall be null and void and may be cancelled of record at the request and the expense of Grantor. If, however, there shall be any default in the performance of the Development Obligations under the Agreement, and if such failure is not cured within thirty (30) days from the date of written notice from Beneficiary to Grantor, then, and in any of such events, it shall be lawful for, and the duty of Trustee, upon request of Beneficiary, to sell the Encumbered Property herein conveyed at public auction for cash, after having first giving such notice of hearing as to commencement of foreclosure proceedings and obtained such findings or leave of court as may then be required by law and giving such notice and advertising the time and place of such sale in such manner as may then be provided by law, and upon such and any resales and upon compliance with the law then relating to foreclosure proceedings under power of sale, to convey title to the purchaser in as full and ample manner as Trustee is empowered (the "**Sale**"). Trustee shall be authorized to retain an attorney to represent him in such proceedings. Beneficiary hereby acknowledges that, except for Grantor's failure to perform the Development Obligations in accordance with the terms of the Agreement (whether pursuant to a Grantor Default under the Agreement or otherwise as therein required), a default by Grantor under the Agreement shall not be deemed a default under this Deed of Trust.

The proceeds of the Sale shall, after Trustee retains his commission, together with reasonable attorneys' fees incurred by Trustee in such proceeding, be applied first to the costs of sale, including, but not limited to, costs of collection, taxes, assessments, costs of recording, service fees and incidental expenditures, and advancements and other sums expended by Beneficiary according to the provisions hereof and otherwise as required by the then existing

H

law relating to foreclosures, with the remaining amount to be paid to Beneficiary. Trustee's commission shall be five percent (5%) of the gross proceeds of the sale or the minimum sum of $500.00, whichever is greater, for a completed foreclosure. In the event foreclosure is commenced, but not completed, Grantor shall pay all expenses incurred by Trustee, including reasonable attorneys' fees, and a partial commission computed on five percent (5%) of the outstanding indebtedness or the above stated minimum sum, whichever is greater, in accordance with the following schedule, to-wit: one-fourth (1/4) thereof before Trustee issued a notice of hearing on the right to foreclosure; one-half (1/2) thereof after issuance of said notice; one-fourth (1/4) thereof after such hearing; and the greater of the full commission or minimum sum after the initial sale.

And said Grantor does hereby covenant and agree with Trustee as follows:

TAXES, ASSESSMENTS, CHARGES. Grantor shall pay all taxes, assessments and charges as may be lawfully levied against said Property prior to the same becoming delinquent. In the event that Grantor fails to pay all taxes, assessments and charges as herein required, then Beneficiary, at his option, may pay the same and the amounts so paid shall be added to the principal of the Agreement secured by this Deed of Trust and shall be due and payable upon demand of Beneficiary.

WASTE. Grantor covenants that it will keep the Property herein conveyed in as good order, repair and condition as they are now, reasonable wear and tear excepted, and will comply with all governmental requirements respecting the Property or their use, and that he will not commit or permit any waste.

WARRANTIES. Grantor covenants with Trustee and Beneficiary that he is seized of the Property in fee simple, that no other person or entity has any possessory or ownership interest in the Property and that there is no lien upon the Property which is superior to this Deed of Trust, other than taxes levied by governmental authorities.

SUBSTITUTION OF TRUSTEE. Grantor and Trustee covenant and agree to and with Beneficiary that in case the said Trustee, or any successor trustee, shall die, become incapable of acting, renounce his trust, or for any reason Beneficiary desires to replace said Trustee, then Beneficiary may appoint, in writing, a trustee to take the place of Trustee; and upon the probate and registration of the same, the trustee thus appointed shall succeed to all rights, powers and duties of Trustee.

☒ **THE FOLLOWING PARAGRAPH 5, SALE OF PROPERTY, SHALL NOT APPLY UNLESS THE BLOCK TO THE LEFT MARGIN OF THIS SENTENCE IS MARKED AND/OR INITIALED.**

SALE OF PROPERTY. Grantor agrees that if the Encumbered Property or any part thereof or interest therein is sold, assigned, transferred, conveyed or otherwise alienated by Grantor, whether voluntarily or involuntarily or by operation of law (other than (i) the creation of a lien or other encumbrance subordinate to this Deed of Trust which does not relate to a transfer of rights of occupancy in the Encumbered Property; (ii) a transfer by devise, decent, or operation of law on the death of a joint tenant or tenant by the entirety; (iii) a transfer to a relative resulting from the death of a Grantor; (iv) a transfer where a spouse or children of Grantor become the owner of the Encumbered Property;  (v) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of Grantor becomes an owner of the Encumbered Property; or (vi) a transfer into an *inter vivo* trust in which Grantor is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the Encumbered Property), without the prior written consent of Beneficiary, Beneficiary, at its own option, may declare the Deposit and the amount of money required to complete the Development Obligations secured hereby and all other obligations hereunder to be forthwith due and payable. Any change in the legal or equitable title of the Encumbered Property or in the beneficial ownership of the Encumbered Property, including the sale, conveyance or disposition of a majority interest in Grantor if a corporation or partnership, whether or not of record and whether or not for consideration, shall be deemed to be the transfer of an interest in the Encumbered Property.

ADVANCEMENTS. If Grantor shall fail to perform any of the covenants or obligations contained herein and Grantor fails to cure the same within ten (10) business days, Beneficiary may, but without obligation, make advances to perform such covenants or obligations, and all such sums so advanced shall be added to the principal sum secured hereby and shall be due from Grantor on demand of Beneficiary. No advancement or anything contained in this

H

paragraph shall constitute a waiver by Beneficiary or prevent such failure to perform from constituting an event of default.

CIVIL ACTION. In the event Trustee is named as a party to any civil action as Trustee in this Deed of Trust, Trustee shall be entitled to employ an attorney at law, including himself if he is a licensed attorney, to represent him in said action and the reasonable attorney's fee of Trustee in such action shall be paid by Beneficiary and added to the principal of the Agreement secured by this Deed of Trust.

OTHER TERMS. N/A

CONDEMNATION. In the event that any or all of the Property shall be condemned and taken under the power of eminent domain, Grantor shall give immediate written notice to Beneficiary and Beneficiary shall have the right to receive and collect all damages awarded by reason of such taking, and the right to such damages hereby is assigned to Beneficiary who shall have the discretion to apply the amount so received, or any part thereof, to the indebtedness due hereunder and if payable in installments, applied in the inverse order of maturity of such installments, or to any alteration, repair or restoration of the Property by Grantor.

PRIOR LIENS. Default under the terms of any instrument secured by a lien to which this Deed of Trust is subordinate shall constitute default hereunder.

UNIFORM COMMERCIAL CODE. Without limitation of Beneficiary's rights of enforcement with respect to the Collateral or any part thereof in accordance with the procedures for foreclosure of real estate, Beneficiary may exercise its rights of enforcement with respect to the Collateral or any part thereof under North Carolina law (or under the Uniform Commercial Code in force in any other state to the extent the same is applicable law) and in conjunction with, in addition to or in substitution for those rights and remedies: (1) Beneficiary may enter upon the Premises to take possession of, assemble and collect the Collateral or, to the extent and for those items of the Collateral permitted under applicable law, to render it unusable; (2) Beneficiary may require Grantor to assemble the Collateral and make it available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of the Collateral; (3) written notice mailed to Grantor as provided herein at least five (5) days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made shall constitute reasonable notice; (4) any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with and upon the same notice as required for the sale of the Property under power of sale as provided above; (5) in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the Collateral and the other Property may, at the option of Beneficiary, be sold as a whole; (6) it shall not be necessary that Beneficiary take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this Section is conducted and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; (7) with respect to application of proceeds of disposition of the Collateral hereunder, the costs and expenses incident to disposition shall include the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing, and the like and the reasonable attorney's fees and legal expenses incurred by Beneficiary; (8) any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the secured indebtedness or as to the occurrence of any default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to notice of time, place, and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Beneficiary, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and (9) Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of the sale, but in the name and on behalf of Beneficiary.

DEED OF TRUST AS FINANCING STATEMENT. This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for record in the real estate records of each county where any part of the Property (including said fixtures) is situated. This Deed of Trust shall also be effective as a financing statement covering any other Property and may be filed in any other appropriate filing or recording office. The mailing address of Grantor is the address of Grantor set forth in the cover of this Deed of Trust and the address of Beneficiary from which information concerning the security interests hereunder may be obtained is the address of Beneficiary set forth in the cover of this Deed of Trust. A carbon, photographic or

H

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

other reproduction of this Deed of Trust or of any financing statement relating to this Deed of Trust shall be sufficient as a financing statement for any of the purposes referred to in this Section.

H

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

IN WITNESS WHEREOF, Grantor has caused this instrument to be signed in its name, as of the day and year first written above.

**<u>GRANTOR</u>:**

_____

By: _____

Name: _____

Title: _____

STATE OF NORTH CAROLINA

COUNTY OF _____

    I certify that the following person personally appeared before me this day and acknowledged to me that he/she signed the foregoing document for the purpose stated therein: _____.

Date:_____          _____
                                           Notary Public
                              Notary Name: _____
                              My Commission Expires: _____

[Affix Notary Stamp or Seal]

H

EXHIBIT A
TO DEED OF TRUST


LEGAL DESCRIPTION OF THE ENCUMBERED PROPERTY

H

## EXHIBIT "I"

## CLOSING AND PRICE ESCALATION SCHEDULE

| Phase | Scheduled closing date | Lots | Lot sizes | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 9/15/2023 | 72 | THs | 63,000 | 4,536,000 | | | |
| 1 | 9/15/2023 | 36 | 40' | 74,250 | 2,673,000 | | | |
| 1 | 9/15/2023 | 21 | 50' | 81,750 | 1,716,750 | | | |
| | | 129 | | | 8,925,750 | | | |
| 2 | 3/15/2024 | 91 | THs | 64,575 | 5,876,325 | | | |
| 2 | 3/15/2024 | 89 | 40' | 76,106 | 6,773,456 | | | |
| 2 | 3/15/2024 | 62 | 50' | 83,794 | 5,195,213 | | | |
| | | 242 | | | 17,844,994 | | | |
| 3 | 9/15/2025 | 45 | THs | 69,300 | 3,118,500 | | | |
| 3 | 9/15/2025 | 97 | 40' | 81,675 | 7,922,475 | | | |
| 3 | 9/15/2025 | 47 | 50' | 89,925 | 4,226,475 | | | |
| | | 189 | | | 15,267,450 | | | |
| 4 | 9/15/2026 | 164 | 40' | 85,388 | 14,003,550 | | | |
| 4 | 9/15/2026 | 61 | 50' | 94,013 | 5,734,763 | | | |
| | | 225 | | | 19,738,313 | | | |
| | Total | 785 | | | 61,776,506 | 6,177,651 | | deposit credit pro-rata per closing |
| | | | | | | | | 10% deposit |

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

<u>EXHIBIT "J"</u>

<u>FORM OF INTERCREDITOR AGREEMENT</u>

Drafted by and after recording return to:

[_____]
[_____]
[_____]
[_____]

_____

*(Space above this line for recording purposes only)*

<u>INTERCREDITOR AGREEMENT</u>

| | |
|---|---|
| STATE OF NORTH CAROLINA | § |
| | § |
| COUNTY OF GUILFORD | § |
| | § |

This INTERCREDITOR AGREEMENT (this "***Agreement***") is entered as of the ____day of ____, 2022, by and among and **TIG ROMSPEN US MASTER MORTGAGE LP**, a Cayman Islands exempted limited partnership ("***Lender***"), **MERITAGE HOMES OF THE CAROLINAS, INC.**, an Arizona corporation ("***Meritage***"), and **MCCONNELL ROAD SOUTH – GSO, LLC**, a North Carolina limited liability company ("***Borrower***").

**R**ECITALS:

A.      Lender and Borrower have entered into that certain Residential Development Loan Agreement (the "***Loan Agreement***") dated as of _____ ____, 20____ (the "***Loan Closing Date***"), providing for a loan by Lender to Borrower of up to the maximum principal sum of $36,200,000.00 (the "***Loan***") for the purpose of developing single-family lots (the "***Lots***") in a proposed subdivision in the City of Greensboro (the "***City***"), Guilford County (the "***County***"), State of North Carolina on certain property more particularly described on ***Exhibit A*** attached hereto and incorporated herein (the "***Property***"), as more particularly described in the Loan Agreement.  The Loan is evidenced by a Promissory Note of even date therewith in the amount of $36,200,000.00, executed by Borrower and payable to the order of Lender (the "***Note***") and is secured, in part, by a Deed of Trust and Security Agreement of even date therewith executed by Borrower to Investors Title Insurance Company, Trustee, for the benefit of Lender covering the Property, filed for record with the Guilford County Registry, North Carolina, in Deed Book _____, Page _____ (the "***Senior Deed of Trust***"). The Note, Loan Agreement, Senior Deed of Trust and all other documents evidencing and securing the Loan are hereinafter collectively referred to as the "***Senior Loan Documents***".

1

B.      Borrower and Meritage have entered into that certain *Purchase and Sale Agreement and Joint Instructions* (for Finished Lots) dated _____ ____ , 20___ (as amended, the "***Lot Contract***") wherein Meritage has agreed to purchase from Borrower all of the Lots (as defined in the Lot Contract and used herein) to be developed on or out of the Property by Borrower.

C.      Pursuant to the Lot Contract, Meritage has delivered into escrow the sum of $6,177,651.00 as the "***Deposit***" (as defined therein, and herein so called), to be released to (or for the benefit of) Borrower upon the terms and conditions stated in the Lot Contract.  As used herein, the term "***Deposit***" shall mean and refer to the Deposit pursuant to the Lot Contract (which has not been refunded or credited in accordance with the Lot Contract), plus any increases or additions thereto pursuant to the terms of the Lot Contract, and any unpaid interest accruing thereon pursuant to the terms of the Lot Contract.

D.      Borrower's obligations under the Lot Contract with respect to the Deposit, and Borrower's obligations under this Agreement are secured by a Deed of Trust (the "***Meritage Deed of Trust***") covering the Property executed by Borrower and recorded or to be recorded with the Guilford County Registry, North Carolina. The Meritage Deed of Trust and all documents executed in connection therewith including, without limitation, the Lot Contract are collectively referred to herein as the "***Meritage Loan Documents***".

E.      As a condition precedent to Meritage's agreement to release its Deposit to (or for the benefit of) Borrower and the subordination of the Meritage Deed of Trust to the Senior Deed of Trust securing payment of the Note, Lender has agreed to enter into this Agreement to consent to the Meritage Deed of Trust and the terms of the Lot Contract, and to set forth the agreements between Lender and Meritage with respect to the rights and obligations of Meritage, as the beneficiary of the Meritage Deed of Trust, and of Lender, as the beneficiary under the Senior Deed of Trust. Meritage has requested that Lender, and Lender has agreed to, notify Meritage in the event of any event of default by Borrower (a "***Loan Default***") under the Loan Documents (to the extent Lender elects to deliver notice thereof to Borrower), and to give Meritage the opportunity to cure such default or purchase the Note and the liens and security interests securing the same, and obtain Meritage's consent to certain amendments to the Loan Agreement and other Loan Documents, all as more fully provided herein.  Notwithstanding anything herein to the contrary, the Lender may elect to waive or elect to not call a default under the Loan Agreement and/or other Loan Documents and in such event there will not be a Loan Default under the terms of this Agreement.

**AGREEMENT**:

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Meritage, and where applicable Borrower, hereby agree as follows:

1.      <u>Defined Terms</u>.  The following terms when used in this Agreement shall have the meaning set forth in this Section 1:

(a)      <u>Business Day</u>.  The term "***Business Day***" means a day of the year on which national banking associations are not required or authorized to close in

2

Greensboro, Guilford County, North Carolina and on which the Guilford County Recorder's Office is open.

(b) <u>Completed Lot(s)</u>. The term ***"Completed Lots"*** means all Lots which satisfy the Finished Lot Condition (as defined in the Lot Contract).

(c) <u>Protective Advances</u>. The term "***Protective Advances***" means all sums advanced by Lender to third parties, as determined by Lender to be reasonably necessary to: (i) protect the priority, validity and enforceability of the liens on, and security interests in, the Property or other collateral securing the Note, and the instruments evidencing the indebtedness and obligations of Borrower to Lender (including but not limited to the payment of real estate taxes and insurance premiums); (ii) prevent the value of the Property from being diminished (assuming the lack of such a payment within the necessary time frame could reasonably cause such Property to lose value); (iii) protect any of the Property from being mismanaged or taken; or (iv) pay all reasonable costs incurred by Lender in enforcing its rights and remedies under the Senior Loan Documents, including reasonable attorney's fees, in the event of a Loan Default.

2. <u>Meritage Opportunity to Cure</u>. In the event of a Loan Default, Lender agrees to give Meritage written notice of such Loan Default (at the same time as notice is given to Borrower or later) and thirty (30) days within which to cure such Loan Default (the "***Cure Period***"). If Meritage cures such default or causes such default to be cured within the Cure Period, Lender agrees to accept such cure for all purposes. Lender acknowledges that Meritage has no obligation to cure any Loan Default. If Meritage cures any Loan Default, such cure will not constitute cure of any default of Borrower under the Meritage Deed of Trust, the Lot Contract or this Agreement. Meritage acknowledges and agrees that Lender may foreclose (or accept a deed in lieu of foreclosure) under the Senior Deed of Trust if there is an uncured Loan Default under any of the Senior Loan Documents and same remains uncured after expiration of the Cure Period.

3. <u>Lender Opportunity to Cure</u>. Meritage acknowledges and consents to the conditional assignment of the Lot Contract from Borrower to Lender as additional security for the Loan. Meritage agrees to provide written notice to Lender (simultaneously with providing written notice to Borrower) of any default by Borrower under the Lot Contract and to allow Lender ten (10) additional Business Days to cure any such default beyond the time period provided Borrower therein.

4. <u>Note Purchase</u>.

(a) In the event of a Loan Default which has not been cured or a default by Borrower under the Lot Contract or the Meritage Deed of Trust, Meritage shall also have the right, but not the obligation, to purchase from Lender the Note (the "***Note Purchase Election***"), together with any and all liens and security interests securing the Note, including, without limitation, the liens and security interests created by the Senior Deed of Trust, by so notifying Lender in writing within ten (10) Business Days after the expiration of the Cure Period. If Meritage does not deliver written notice of its Note Purchase Election within said ten (10) Business Day period, or if Meritage timely

3

makes the Note Purchase Election but fails to close on the purchase of the Note and Lender's interest in the Senior Loan Documents within the fifteen (15) Business Day period described below, then Meritage shall have no further right to purchase the Note and liens and security interests securing the same and, thereafter, Lender may pursue its rights to foreclose (or accept a deed in lieu thereof) and the provisions of Section 8 hereof shall become operative. Nothing in this Agreement shall preclude the right of Lender to initiate the pursuit of its remedies available under the Senior Loan Documents in accordance with applicable law including, without limitation, posting the Property for foreclosure, concurrently with the time periods provided for in Sections 2 or 4, so long as Meritage is afforded the opportunity to cure the Loan Default within the Cure Period and is given the opportunity to make the Note Purchase Election within the timeframe allowed under this Section 4.

(b)     If Meritage makes the Note Purchase Election, the closing of the purchase of the Note by Meritage shall occur through a mutually acceptable escrow agent (hereinafter, the "***Escrow Agent***") on or before the close of business on the fifteenth (15th) Business Day after Lender's receipt of the Note Purchase Election. At such closing, (a) Meritage shall deliver to Lender cash or immediately available funds in an amount equal to the unpaid principal balance of the Loan, together with (i) any unpaid accrued interest owed to Lender at such time under the Note, excluding any default interest, (ii) the amount of any Protective Advances that have not been added to the principal balance of the Note, and (iii) any prepayment, exit or other fees otherwise due under the terms and conditions of the Senior Loan Documents, in an aggregate amount not to exceed one full month of accrued interest based on the then-outstanding principal balance of the Loan, all of which must be evidenced by proper records, invoices and canceled checks or other commercially reasonable proof of payment (collectively, the "***Purchase Amount***"); and (b) Lender shall concurrently deliver to Meritage (i) a fully executed general assignment of the Note, the Senior Deed of Trust and all other security instruments and related Senior Loan Documents, which must be (in form and substance) reasonably acceptable to Meritage, (ii) a separate assignment of the beneficial interest under the Senior Deed of Trust, which shall be (in form and substance) reasonably acceptable to Meritage, shall be in recordable form and must be duly executed and acknowledged by Lender, (iii) the original of the Note, duly executed by Borrower and endorsed by Lender to Meritage (or its successor-in-interest), (iv) the originals of all other Senior Loan Documents, and (v) copies of all default and other material notices between Lender and Borrower concerning the Loan. Any such assignment and endorsement by Lender shall be without recourse or warranty of any kind, other than a warranty that Lender is the sole owner and holder of the Note (subject to the assignment rights provided in Section 10(c) below), and a warranty as to the outstanding principal balance and unpaid accrued interest on the Note, and shall be in form and substance reasonably acceptable to Lender and Meritage and their respective counsel. Upon written request by Meritage, but in no event more frequently than once per calendar quarter, Lender shall inform Meritage of the current outstanding principal balance of the Loan at such time and shall confirm (in the form of a reasonable estoppel) whether the Loan is in good standing at such time. Following any Loan Default by Borrower and any Note Purchase Election by Meritage, Lender shall promptly provide to Meritage copies of all fully executed Senior Loan Documents, together with the Purchase Amount as of such date.

5.     Subordinate Deed of Trust.

(a)     Lender's Consent. The Meritage Deed of Trust shall be subordinate in all respects

to the Senior Deed of Trust and any other concurrent liens and security interests securing the Loan and including all renewals or extensions thereof, provided no such renewals or extensions increase the principal amount of the Loan. Notwithstanding the foregoing or any provision in the Loan Agreement or any of the other Senior Loan Documents that purport to secure indebtedness unrelated to the Property including, without limitation, any cross-default provisions applicable to any unrelated indebtedness, shall be ineffective as against Meritage, and the Meritage Deed of Trust shall have priority over any such unrelated indebtedness. Lender consents to the Meritage Deed of Trust.

(b)     Standstill.  Except as expressly provided in this Agreement, during the Standstill Period (as defined herein), Meritage shall not exercise any remedy under the Meritage Deed of Trust to collect the Deposit, but the foregoing shall not limit or otherwise impair Meritage's rights and remedies granted in the Lot Contract with respect to any other representations, warranties, obligations or covenants of Borrower arising thereunder, nor shall it impair Meritage's rights and remedies to enforce the obligation of Borrower to provide Deposit credit at Lot closing(s). As used herein, the term "***Standstill Period***" shall mean the period commencing on the date hereof and ending on the first to occur of the following: (i) the date any insolvency, bankruptcy, receivership, assignment for the benefit of creditors, reorganization or arrangement with creditors of Borrower, whether or not pursuant to the bankruptcy laws, or any dissolution, liquidation or marshaling of the assets and liabilities of Borrower, (ii) the date of the acceleration or enforcement of the maturity of the Loan, or (iii) the then stated maturity date of the Loan.

6.     Borrower's Covenants.  Borrower hereby covenants and agrees as follows:

(a)     A Loan Default by Borrower shall constitute an event of default under the Meritage Deed of Trust and this Agreement and, subject to the "standstill" provisions in Section 5(b) above, shall entitle Meritage to exercise its rights and remedies thereunder and hereunder, at its sole option, without any requirement of notice or opportunity to cure, notwithstanding anything to the contrary contained herein or in the Meritage Deed of Trust.

(b)     A default by Borrower under this Agreement shall constitute an event of default under the Meritage Deed of Trust and, subject to the "standstill" provisions in Section 5(b) above, shall entitle Meritage to exercise its rights and remedies hereunder and thereunder, at its sole option, without any requirement of notice or opportunity to cure, notwithstanding anything to the contrary contained in the Lot Contract.

(c)     Any amounts paid by Meritage to cure or attempt to cure a Loan Default and any reasonable out-of-pocket expenses incurred by Meritage to cure or attempt to cure any Loan Default shall be due and payable by Borrower upon demand therefor by Meritage and shall constitute additional indebtedness secured by the Meritage Deed of Trust.  If the Lot Contract remains in effect following any such cure or attempted cure by Meritage, and if such amount is not paid by Borrower to Meritage prior to the next closing to occur under the Lot Contract (but only to the extent Lender still receives its Partial Release Price, as that term is defined in the Loan Agreement and used herein), such amount shall be credited against the purchase price payable by Meritage at the next closing or any subsequent closing under the Lot Contract until fully credited (but only to the extent Lender still receives its Partial Release Price).  Any amounts so paid by Meritage shall bear interest at the lesser of eighteen percent (18%) per annum or the maximum

5

rate permitted by applicable law until reimbursement is made to Meritage. Borrower's failure to timely pay such amounts to Meritage shall constitute a default by Borrower under this Agreement. As used in this Agreement, the term "Lots" shall have the meaning as defined in the Lot Contract.

7.      (a)      <u>Lender's Certification</u>.  Lender hereby certifies to Meritage as follows:

(i)      Lender is the sole legal and equitable owner and holder of the Loan, the Note and the Senior Loan Documents (subject to the assignment rights provided in Section 10(c) below). The Note may be prepaid in full or in part at any time prior to maturity in accordance with the terms and conditions of the Loan Agreement, except with respect to any applicable prepayment premium, penalty or fee, which shall be limited to a maximum of one full month of accrued interest based on the then-outstanding principal balance of the Loan.

(ii)      No Loan Default currently exists and to the current actual knowledge of Lender, no event has occurred which, with the passage of time or giving of notice or both, would constitute a Loan Default.

(iii)      Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Lender enforceable against Lender in accordance with its terms subject to: (i) applicable bankruptcy, reorganization, insolvency and moratorium laws and (ii) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity

(b)      <u>Meritage's Certification.</u>  Meritage certifies to Lender as follows:

(i)      Meritage it is the sole holder of the Meritage Loan Documents and the buyer's interest in the Lot Contract;

(ii)      that there has been no assignment of Meritage's rights and interests under the Meritage Loan Documents or the Lot Contract to any person and there has been no assignment of Meritage's rights and interests in the indebtedness secured thereby, in both instances to any person;

(iii)      there currently exists no default and to the current actual knowledge of Meritage, no event has occurred which, with the giving of notice or the lapse of time, or both, would constitute a default under any of Meritage Loan Documents or the Lot Contract; and

(iv)      Meritage has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Meritage enforceable against Meritage in accordance with its terms subject to: (i) applicable bankruptcy, reorganization, insolvency and moratorium laws and (ii) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

8.    <u>Agreements of Lender and Borrower</u>. Borrower and Lender hereby agree as follows:

(a)    If, prior to completion to the Lots to Finished Lot Condition (as defined in the Lot Contract), Lender acquires title to the Property, whether through foreclosure of the Senior Deed of Trust or by deed in lieu of foreclosure (assuming Meritage was provided written notice and opportunity to cure the applicable Loan Default and/or make the Note Purchase Election as provided herein) (each, a "***Foreclosure Event***"), then the Lot Contract shall be deemed cancelled effective on the date of the Foreclosure Event (as defined below). If the Lot Contract terminates as provided in this Agreement or otherwise, Lender shall not be obligated to refund or pay to Meritage any portion of the Deposit that has not been credited to Meritage in the form of a Deposit Credit (as defined in the Lot Contract), and such portion of the Deposit shall be considered part of Borrower's forfeited equity in the Property (and Meritage waives any claims or causes of action against Lender or Successor Owner (as defined below) with respect to such Deposit); provided, however, that Meritage shall not be deemed to have waived any claims or causes of action against Borrower with respect to such Deposit.

(b)    If (i) any or all of the Lots satisfy the Finished Lot Condition (as defined in the Lot Contract) at the time of any Loan Default, and (ii) Meritage does not exercise its above-described right to cure a default, purchase the Note and liens, (iii) Lender, its assigns or any buyer at a foreclosure sale or by deed in lieu of foreclosure (each being hereinafter called "***Successor Owner***") acquires title to all or a portion of the Property, through a Foreclosure Event, and (iv) Meritage gives Lender an Election Notice pursuant to Section 8(c) below, then (1) Successor Owner shall comply with the Successor Owner Obligations (hereinafter defined) (the Lot Contract terminates with respect to any Lots which do not satisfy the Finished Lot Condition), provided however, nothing herein shall be construed to obligate Lender or Successor Owner to perform any obligations under the Lot Contract other than the Successor Owner Obligations, including any additional development work on said Lots, (2) Meritage will attorn to Successor Owner as the seller under the Lot Contract with respect to the Lot purchase and other obligations of Meritage under the Lot Contract (the "***Lot Purchase Obligations***"), (3) the Lot Contract shall not be extinguished or terminated by reason of such Foreclosure Event, but rather the Lot Contract shall continue in full force and effect as modified herein only for the Lots which satisfy the Finished Lot Condition at such time (the Lot Contract shall terminate with respect to any Lots which are not in Finished Lot Condition at such time), and (4) Successor Owner shall recognize and accept Meritage as the purchaser of the Property under the Lot Contract subject to the terms and provisions of the Lot Contract, including the obligation to credit or apply the Deposit as provided in the Lot Contract, but only to the extent Meritage performs all of its obligations necessary to receive the applicable Deposit Credit, except in no event shall Successor Owner be:

(i)    subject to any offsets (excluding the obligation to credit or apply the Deposit as provided in the Lot Contract but only to the extent that Successor Owner receives at least the Partial Release Price as the purchase price in connection with the sale of any Lot under the Lot Contract) or defenses that Meritage might have against any prior "Seller" (including Borrower) or arising prior to a Foreclosure Event;

(ii)    bound by any representations and warranties made by Borrower under the Lot Contract;

7

(iii)     responsible for any obligation, act or action under the Lot Contract as to the closing of any Lot to be acquired by Meritage under the terms of the Lot Contract, including but not limited to any post-closing warranties or indemnities contained therein, other than (A) the execution and delivery of a special warranty deed, (B) the execution and delivery of a non-foreign affidavit, (C) the execution and delivery of a closing statement and partial release of lien for any liens held by Successor Owner, and (D) the credit or application of Deposit as set forth in the Lot Contract (collectively the "***Successor Owner Obligations***"), provided Lender receives the Partial Release Price for each Lot.  Further, Successor Owner shall have no duty to (1) cure any defect related to the Property (including without limitation, any defect related to payment of taxes (Lender has no obligation to pay delinquent taxes in connection with these closings), Lot construction or completion, maintenance, title, environmental issues or otherwise) other than liens in favor of Successor Owner, (2) construct or complete any improvements, (3) pay any broker commissions, or (4) take any other or similar measures even if required of the Borrower under the Lot Contract;

(iv)     bound by any payment or prepayment, other than the Deposit, by Meritage of any of the Purchase Price for any Lots not yet closed by Meritage under the Lot Contract, unless and to the extent such prepayment was paid over to and received by Successor Owner; provided, however, that notwithstanding anything to the contrary in this Agreement, Meritage shall be entitled to a credit in accordance with the applicable terms of the Lot Contract for the full amount of any Deposit not yet applied or credited against the Purchase Price for any Lots which Meritage closes under the terms of the Lot Contract after Successor Owner acquires title to the Property as long as Lender receives the Partial Release Price for each Lot;

(v)     required to refund any portion of the Deposit to Meritage, except in the event Successor Owner fails to convey the Lots to Meritage as provided in the Lot Contract within the time periods required therein as same may be extended due to any notice and cure periods (Meritage shall be entitled to a credit of the Deposit against the purchase price of the Lots under the Lot Contract, provided Lender or Successor Owner receives the Partial Release Price for each such Lots);

(vi)     bound by any amendment or modification of the Lot Contract hereafter made without the written consent of Lender (or Successor Owner, after a Foreclosure Event);

(vii)     liable for any default, act or omission of Borrower under the Lot Contract, and Meritage waives any claims against Successor Owner related to any such default, act or omission of Borrower; or

(viii)     personally liable under the Lot Contract. Successor Owner's liability under the Lot Contract shall be limited to the ownership interest of Successor Owner in that portion of the Property being purchased by Meritage under the Lot Contract.

(c)     In the event Successor Owner acquires title to the Property through a Foreclosure

8

Event, Meritage shall give Successor Owner written notice (the "***Election Notice***") within fifteen (15) Business Days after Meritage receives written notice of such Foreclosure Event and the address of Successor Owner of Meritage's election to either cancel the Lot Contract, or continue to perform its Lot Purchase Obligations in accordance with Section 8(a) and 8(b) above. If Meritage fails to timely give the Election Notice, the Lot Contract shall be deemed cancelled effective on the date of the Foreclosure Event. In the event that Meritage timely gives the Election Notice and elects to continue to perform its Lot Purchase Obligations, Lender and Meritage acknowledge and agree that following a Foreclosure Event, that the provisions in Section 8(a) and Section 8(b) as well as the following provisions will apply and will control over any conflicting terms in the Lot Contract:

(i)     any Lots purchased by Meritage from Successor Owner shall be purchased on an "as-is, where-is" basis, subject only to the warranties in the deed delivered by Successor Owner;

(ii)    Meritage waives the right to enforce any of Borrower's obligations under the Lot Contract whatsoever against Successor Owner other than the Successor Owner Obligations;

(iii)   the initial Lot takedown closing under the Lot Contract after the Foreclosure Event for the Completed Lots shall occur on the earlier to occur of the closing date provided in the Lot Contract or the thirtieth (30th) day after Successor Owner acquires title to the Property, and any and all subsequent Lot takedown closings under the Lot Contract shall occur at a closing ninety (90) days following the prior closing under the Lot Contract after the Foreclosure Event.

(iv)    except in the event of a failure by Successor Owner after a Foreclosure Event to comply with the Successor Owner Obligations, which exists beyond any applicable cure period: (i) Meritage shall be obligated to purchase all of the Lots in Finished Lot Condition which are owned by Successor Owner in accordance with the terms and provisions of the Lot Contract, as amended by the terms and provisions of this Agreement and shall have no right to elect not to close on any such completed Lots for any reason (Meritage shall have no rights to purchase any portion of the Property which has not achieved Substantial Completion, unless otherwise agreed, in writing, between Meritage and Successor Owner), and (ii) the Lot Contract shall be deemed cancelled if Meritage either fails to timely close on any Completed Lot under the terms of the Lot Contract as amended by this Agreement (without any notice and cure period) or defaults on its other obligations under the terms and provisions of the Lot Contract as amended by this Agreement and such default continues beyond the notice and cure period provided in the Lot Contract.

(d)     Borrower and Lender agree to cooperate with Meritage in connection with any proposed cure by Meritage of a Loan Default, including providing copies of the Loan Documents to Meritage. **Notwithstanding anything herein to the contrary, any references to Partial Release Prices being paid hereunder shall at all times mean that Lender must receive net of any and all closing costs or other costs or credits of the applicable portion of deposit under**

9

the Lot Contract, the full Partial Release Price for any Lot for Lender to be able to release its lien on such lot or convey such lot.

(e)     Borrower hereby covenants and agrees that Lender and Meritage may communicate (such communications in any form, whether written, oral or otherwise, collectively, the "***Communications***") directly with each other, with or without Borrower being a party and in any event without any further consent from Borrower, about any and all matters relating to (i) the development of the Property (hereinafter, the "***Project***") contemplated or referenced in the Note, the Meritage Deed of Trust, the Senior Loan Documents, the Lot Contract, the Senior Deed of Trust or any other documents executed in connection with or related, directly or indirectly, to the aforementioned documents (collectively, the "***Project Documents***"), (ii) the Project Documents, or (iii) any other matters reasonably relevant to the Project or the Project Documents.   The Communications may include, but shall not be limited to, discussions relating to default remedies that may be pursued or possible loan restructurings or workout arrangements in connection with a default under any of the Project Documents.   Borrower hereby authorizes such communications and waives any and all rights to notice (whether prior, concurrent or after the fact) of the Communications.   IN ADDITION, BORROWER HEREBY RELEASES LENDER AND MERITAGE, AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, LEGAL REPRESENTATIVES, EMPLOYEES, PARTNERS, MEMBERS AND MANAGERS (ALL THE FOREGOING BEING COLLECTIVELY REFERRED TO HEREIN AS THE "***RELEASED PARTIES***"), FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, AND OTHER ACTIONS OR CHARGES NOW OR HEREAFTER EXISTING, WHETHER KNOWN OR UNKNOWN, IN CONTRACT OR IN TORT (COLLECTIVELY, THE "***CLAIMS***"), WHICH BORROWER MAY HAVE ARISING OUT OF OR RELATING TO THE COMMUNICATIONS (INCLUDING, WITHOUT LIMITATION, THE OMISSION OR FAILURE OF LENDER AND MERITAGE TO HAVE THE COMMUNICATIONS).

(f)     The provisions of this Section 8 shall survive any foreclosure of the Senior Deed of Trust or any conveyance of the Property by deed in lieu thereof.

9.     <u>Amendment of Documents</u>.

(a)     Without Meritage's prior written consent (which may be granted or withheld in Meritage's sole discretion), Lender and Borrower shall not amend the Loan Documents to (a) increase the stated principal amount of the Note other than by the amount of any Protective Advances, (b) increase the interest rate, (c) increase the required principal payments under the Note other than as a result of an increase in principal permitted by (a) above, (d) prohibit prepayment of the Note, (e) be cross-defaulted or cross-collateralized with any other loans or obligations, or (f) increase the amount required to obtain partial releases of portions of the Property from the Senior Deed of Trust.   Notwithstanding same, Lender and Borrower may renew and extend the maturity date of the Note or any date by which any improvements described in the Loan Documents are required to be complete without Meritage's consent (but any such extension shall not change or extend any applicable deadlines for substantial completion of the Lots, as set forth in the Lot Contract or the other obligations of Borrower under the Lot Contract).   Any waiver of terms of the Loan Agreement or the other Loan Documents shall not be deemed an amendment of same unless it violates any of the provisions of this Section 9(a).

(b)     Without Lender's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), Meritage and Borrower shall not (a) amend the Lot Contract or any of the Meritage Loan Documents in any material respect including, without limitation, any amendment to (a) the amount of the Deposit, (b) the applicable Purchase Price for Lots that satisfy the Finished Lot Condition, (c) increase the amount required to obtain partial releases of portions of the Property from the Meritage Deed of Trust, (d) be cross-defaulted or cross-collateralized with any other loans or obligations owed to Meritage, (e) change the schedule of "Closings" of the Lots under the Lot Contract (as such terms are defined in the Lot Contract), or (f) add any additional conditions on either party to close.  Meritage and Borrower may renew and extend the Closing Date under the Lot Contract, or any date by which any improvements described in the Lot Contract or in the Meritage Loan Documents are required to be complete without Lender's consent (but any such extension shall not change or extend the applicable Substantial Completion Date as set forth in the Loan Agreement or the other obligations of Borrower under the Note, the Loan Agreement, the Senior Deed of Trust or any other document executed in connection therewith).

10.    Miscellaneous.

(a)     Any notice required or permitted hereunder shall be given in writing and sent by certified mail, return receipt requested, to the parties hereto at the following addresses:

|  |  |
|---|---|
| If to **Lender**: | TIG Romspen US Master Mortgage LP<br>162 Cumberland Street, Suite 300<br>Toronto, Ontario M5R 3N5<br>Attn:   Vince Berry |
| With copy to: | Katten Muchin Rosenman LLP<br>550 S Tryon Street, Suite 2900<br>Charlotte, NC 28226<br>Attn:   J. Hayden Harrell |
| If to **Meritage**: | Meritage Homes of the Carolinas, Inc.<br>3300 Paramount Parkway, Suite 120<br>Raleigh, North Carolina  27560<br>Attn: Ric Rojas<br>Phone:  (919) 926-2610<br>Email: rick.rojas@meritagehomes.com |
| With a copy to: | Meritage Homes of the Carolinas, Inc.<br>8800 E. Raintree Drive, Suite 300<br>Scottsdale, Arizona 85260<br>Attn:   Darrell S. Husband<br>Phone: (480) 515-8984<br>Email: darrell.husband@meritagehomes.com |
| And With a copy to<br>Of any Default<br>Notice to: | Meritage Homes Corporation<br>8800 E. Raintree Drive, Suite 300<br>Scottsdale, Arizona 85260 |

11

Attn: General Counsel

If to **Borrower**: McConnell Road South – GSO, LLC
610 Pembroke Road, #10007
Greensboro, North Carolina 27408
Attn: Zachary Tran
Phone: (336) 324-4688
Email: ztran@digllc.com

With a copy to: Jennifer N. Fountain, Esq.
Isaacson Sheridan
804 Green Valley Road, Suite 200
Greensboro, North Carolina 27408

(b) Lender agrees to send to Meritage copies of all notices and correspondence regarding an express default or event of default under the Loan, the Note and/or the Loan Documents which Lender sends to Borrower at the same time such notices and correspondence are sent by Lender to Borrower.

(c) Lender may assign or otherwise transfer its rights under this Agreement, but only in conjunction with an assignment or transfer of the Loan; any transfer or assignment of the Loan (or the grant of any participation rights thereunder) shall be made subject to this Agreement, and any transferee, assignee or participant shall be bound by this Agreement. The parties hereto acknowledge that Lender shall collaterally assign the Note, the Senior Deed of Trust and related documents as security for its line of credit(s). Meritage may assign or otherwise transfer its rights under this Agreement, but only in conjunction with an assignment or transfer of Meritage's rights under the Lot Contract (to the extent permitted thereby), and any such transfer or assignment shall be made subject to this Agreement. Any transferee or assignee of Meritage must expressly acknowledge this Agreement, assume all of Meritage's duties and obligations under this Agreement, and agree in writing to be bound by this Agreement. Upon such assumption by Meritage's transferee or assignee of this Agreement, such transferee or assignee shall be entitled to all rights and benefits granted to Meritage under this Agreement. Borrower may not assign or transfer its rights, duties and obligations under this Agreement without the prior written consent of Lender and Meritage.

(d) This Agreement and the rights and obligations of the parties hereunder shall be constructed and determined in accordance with the laws of the State of North Carolina. Venue in any dispute arising due to the alleged breach of this Agreement shall lie in the federal or state courts of Guilford County, North Carolina.

(e) This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof.

(f) This Agreement shall be filed of record against the Property in the county in which the Property is situated to give notice of the agreements and obligations of the parties set forth herein. Any agreements or obligations herein which are performable following a foreclosure or deed in lieu thereof shall continue and survive thereafter notwithstanding anything to the contrary

12

contained elsewhere herein or in the Senior Deed of Trust or in any document evidencing, securing or pertaining to the Loan. Any person or entity acquiring title to the Property at foreclosure sale or by deed shall take title subject to such continuing obligations herein notwithstanding any such foreclosure sale or deed. This Agreement shall cease and terminate only by written agreement of Lender and Meritage, or their respective successors and assigns, or upon release of record of both the Senior Deed of Trust and the Meritage Deed of Trust or upon termination of the Lot Contract.

(g)     Whenever used herein, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders. The captions, headings and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

(h)     If any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Notwithstanding anything herein to the contrary, Lender shall have no liability hereunder for any Successor Owners failure to comply with the terms, provisions and conditions of this Agreement, unless Lender is the Successor Owner.

(i)     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

(j)     NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER THIS AGREEMENT NOR ANY AMENDMENT OF THIS AGREEMENT SHALL BE A VALID AND ENFORCEABLE OBLIGATION OF MERITAGE UNLESS THIS AGREEMENT OR SUCH AMENDMENT IS EXECUTED BY RIC ROJAS OR ANY OTHER OFFICER OF MERITAGE, IN HIS OR HER AUTHORIZED CAPACITY.

[SIGNATURE PAGES FOLLOW]

13

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

**EXECUTED** in duplicate counterparts, each of which shall be deemed an original.

**LENDER:**

**TIG ROMSPEN US MASTER MORTGAGE LP,** an exempted Cayman Islands limited partnership

By:     Romspen US Master Mortgage GP LLC, a Delaware limited liability company, its general partner

        By:     Romspen US Master Mortgage GP Inc., the general partner of its sole member

            By:    _____

                Name:
                Title:

STATE OF _____ §
                     §
COUNTY OF _____§

    Before me, _____, on this day personally appeared _____, _____ of TIG ROMSPEN US MASTER MORTGAGE LP, a Cayman Islands exempted limited partnership, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

    Given under my hand and seal of office this _____ day of _____, 2022.

                     _____

[ S E A L ]                Notary Public, State of _____

Intercreditor Agreement

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

**MERITAGE:**

**MERITAGE HOMES OF THE CAROLINAS, INC.,** an Arizona corporation

By: _____
Name: _____
Title: _____

STATE OF _____

COUNTY OF _____

     I, _____ (Notary Public), do hereby certify that Meritage Homes of the Carolinas, Inc., an Arizona corporation, by _____, its _____, personally appeared before me and acknowledged the due execution of the foregoing instrument.

     WITNESS my hand and notarial seal this the _____ day of _____, 2022.

_____
Notary Public

[Affix Seal]

My Commission Expires:

Intercreditor Agreement

**BORROWER:**

**MCCONNELL ROAD SOUTH – GSO, LLC,** a
North Carolina limited liability company

By: _____ (SEAL)
               Name:
               Title:

STATE OF NORTH CAROLINA   §
                                   §
COUNTY OF _____   §

      I, _____, a Notary Public of the County and State aforesaid, certify that [_____], whose identity has been proven by satisfactory evidence, said evidence being:

      ☐     I have personal knowledge of the identity of the principal(s);

      ☐     I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a _____; or

      ☐     A credible witness has sworn to the identity of the principal(s);

who is the Manager of McConnell Road South – GSO, LLC, personally appeared before me this day and acknowledged that he is the Manager of McConnell Road South – GSO, LLC and that as Manager of McConnell Road South – GSO, LLC being duly authorized to do so, voluntarily executed the foregoing instrument on behalf of McConnell Road South – GSO, LLC, for the purposes stated therein.

      WITNESS my hand and notarial seal this the _____ day of _____, 2022.

_____
Notary Public

[Affix Seal]

My Commission Expires:

Intercreditor Agreement

DocuSign Envelope ID: 6441B163-0235-45EB-8C70-3A20D603B641

# EXHIBIT A

## THE PROPERTY

Beginning at an existing iron rod at the centerline intersection of Village Road, S.R. 3073 and McConnell Road, S.R. 3072, having a North Carolina State Plane Coordinate (Epoch 2011) value of North 835367.12 feet, East 1817428.32 feet. Thence with the centerline of McConnell Road N53° 45' 57"E, 29.59' to an existing nail; thence with a curve to the right having a radius of 2980.00' a length of 1024.12', and a chord bearing and distance of N63° 36' 40"E, 1019.09' to an existing nail; thence N73° 27' 23"E, 47.21' to an existing nail; thence with a curve to the right having radius of 2980.00', a length of 432.64', and a chord bearing and distance of : N77° 36' 36"E, 432.26' to an existing nail; thence N81° 46' 29"E, 637.05' to an existing nail; thence leaving McConnell Road S1° 17' 17"W, 1290.13' to a 5/8" capped rebar set; thence S1° 17' 17"W, 1147.26' to a 5/8" capped rebar set, witness by an existing iron rod which bears  S 87° 16' 06"E, 5.22';  thence N87° 16' 06"W, 1314.38' to an existing planted rock; thence S28° 12' 53"W, 909.65' to an existing iron rod; thence S34° 07' 15"W, 939.49' to an existing iron rod; thence N79° 59' 33"W, 560.70' to an existing iron rod; thence S12° 17' 49"W, 402.46' to an existing iron rod; thence N83° 15' 40"W, 665.58' to an existing iron pipe; thence N83° 38' 42"W, 98.94' to an existing iron pipe; thence N83° 34' 22"W, 95.68' to an existing iron pipe' thence N4° 35' 46"E, 263.44' to an existing iron pipe; thence N83° 35' 15"W, 169.81' to an existing iron pipe; thence N2° 48' 04"E, 398.60' to an existing iron pipe; thence N2° 44' 11"E, 124.48' to an existing iron pipe; thence S88° 38' 24"E, 628.19' to an existing iron pipe; thence N2° 47' 04"E, 859.39' to a 5/8" capped iron rod set; thence N04° 23' 00"E, 4.95' to an existing iron pipe; thence N22° 23' 56"E, 434.48' to a 5/8" capped iron rod set; thence  S87° 04' 38"E, 100.81' to a 5/8" capped iron rod set; thence N8° 43' 52"E, 619.22' to a nail set in the centerline of McConnell Road; thence with a curve to the left having a radius of 862.44', a length of 26.81', and a chord bearing and distance of N39° 54' 40"E, 26.81' to a point; thence N39° 01' 14"E, 283.70' to a point; thence with a curve to the right having a radius of 1978.32', a length of 498.34', and a chord bearing and distance of N46° 14' 14"E, 497.03' to a point; thence N53° 32' 35"E, 397.07' to the Beginning. Containing 195.380 acres more, or less, and containing the properties having the following North Carolina Parcel Identification Numbers: P/O 8813749709, 8813638023, 8813634730

Intercreditor Agreement